Judith F. HAMRICK, Appellant,

v.

SHISHALDIN FISHERIES, INC., and Northwestern National Insurance Company of Milwaukee, Wisconsin, and Talbot, Bird & Company, Inc., Appellees.

No. S–100.

Supreme Court of Alaska.

Nov. 8, 1985.

Richard J. Smith, Anchorage, for appellant.

Ann K. Stokes and Madelon Blum, Bradbury, Bliss, & Riordan, Inc., Anchorage, for appellees.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

OPINION

RABINOWITZ, Justice.

In January, 1973, Grady L. Hamrick drowned near Seldovia, Alaska while trying to rescue the first mate of the vessel Shishaldin, a boat owned by Shishaldin Fisheries, Inc. (Shishaldin). Grady's widow, Judith Hamrick, brought a wrongful death action against Shishaldin Fisheries, Inc., which carried both primary and excess insurance coverage. Interstate Insurance Company (Interstate), the primary insurer, had issued a $100,000 policy. Northwestern National Insurance Company (Northwestern), the excess carrier, had issued an excess policy with a $400,000 face value.

Interstate's attorneys referred the case to Anchorage attorney Daniel Moore who entered an appearance for Shishaldin and began settlement discussions.[1] As discovery progressed, evidence came to light indicating that certain crew members aboard the Shishaldin had been negligent with regard to the accident and had given perjurous testimony. Interstate, realizing that the case would not settle for under $100,000, "threw in" its policy limits, leaving Northwestern in charge of negotiating the final settlement figure.

In late 1974, Moore and Bernard Kelly, Hamrick's attorney in the wrongful death action, met in Seattle and agreed to ask their clients for authority to settle the case for $400,000. The parties' discussions apparently referred only to the total settlement amount, and did not specify what proportion of the total obligation each insurer would be responsible for paying. Northwestern agreed to the $400,000 figure and on February 25, 1975, Judith Hamrick signed a "Release of All Claims" in which she agreed, in consideration of a payment of $400,000, to release Shishaldin, Interstate, Northwestern and "any and all

---

1. Justice Moore did not participate in the resolution of this appeal.

other persons, firms and corporations" from liability for all causes of action arising out of her husband's death.

Hamrick never received the $400,000, however, because Interstate, the primary carrier, went into receivership. In an agreement between the parties executed in March 1975, Northwestern agreed to pay Hamrick $307,000. In return, Hamrick promised to dismiss with prejudice the action against Shishaldin and to make reasonable efforts to collect the remaining $93,-000 from Interstate.[2] Hamrick did not, however, waive her rights against Northwestern for the amount not recovered from Interstate. Hamrick eventually collected approximately $16,000 from Interstate, and brought this action against Northwestern to recover the balance.

After a non-jury trial, the superior court concluded that Northwestern was not liable for the unpaid balance of the agreed settlement. Hamrick thereafter brought this appeal.

The parties differ over the proper interpretation of the February 25, 1975 settlement agreement. Hamrick contends that the two insurance carriers agreed to be jointly and severally liable for the full settlement amount of $400,000. Northwestern argues, however, that it only agreed to pay its share of the settlement, which is $300,000 plus costs and attorney's fees.

Among the trial court's factual findings were the following:

7. A settlement agreement was reached for $400,000.00 between Hamrick, Northwestern and Interstate.

8. The parties agreed Hamrick would be paid pursuant to the amounts the carriers were required to pay under their policies.

9. A $400,000.00 settlement was approved by Northwestern which provided that Interstate would pay $100,000.00, less costs and fees, and Northwestern would pay the balance.

10. Northwestern gave Mr. Moore authority to settle with Northwestern paying $300,000.00 plus legal costs and fees, for a total of $400,000.00.

11. Neither Moore nor any other representative of Northwestern or Talbot, Bird expressed other authority than that granted.

12. Counsel for plaintiff (Mr. Kelly) knew or should have known that one of the two insurance companies issued a primary policy with a limit lower than $400,000.00.

13. Counsel for plaintiff (Mr. Kelly) knew or should have known that both Northwestern and Interstate provided contributions for defendants' counsel's authority to settle.

Given that the superior court had the opportunity to evaluate the credibility of the witnesses firsthand, this court will not reverse its factual findings unless they are clearly erroneous. *Kennedy Associates, Inc. v. Fischer*, 667 P.2d 174, 179 (Alaska 1983).

Kelly's testimony concerning his knowledge of the various insurance policies is somewhat vague. Hamrick's counsel Richard Smith argued at trial that Kelly "thought there was simply a $500,000 policy." Kelly testified, however, that he was not sure whether he knew at the time of the negotiations that more than one insurance interest was involved. He also said that he had no independent recollection of receiving the policies. Moore, however, testified that he was certain that the policies had been produced during discovery and that he had discussed with Kelly the type of coverage the two policies provided.[3]

2. Interstate's policy provided that its defense costs would be deducted from the $100,000 face value. It had paid out $7,000 in attorney's fees and was thus liable under its policy for $93,000. Northwestern was therefore liable as an excess insurer for all claims exceeding $93,000. Because the total settlement was for $400,000, its

obligation under the settlement was at least $307,000.

3. Moore said "Bernie [Kelly] knew as well as I knew that the primary would pay its part and the excess would pay its."

Given this evidence, we conclude that the superior court's findings concerning the knowledge of Hamrick's attorney were not clearly erroneous. Since Kelly should have known, and probably did know, that Shishaldin was insured by both a primary carrier and an excess carrier, we hold that Hamrick's interpretation of the settlement agreement cannot be sustained.

In interpreting contractual agreements, this court seeks to give effect to the reasonable expectations of the parties. *Mitford v. de LaSala,* 666 P.2d 1000, 1005 (Alaska 1983). Had it been Northwestern that became insolvent and Interstate that was sued, the unreasonableness of Hamrick's interpretation would be more obvious. It is unlikely that Interstate, which had already agreed to pay the full amount of its policy, would agree to a settlement exposing it to a potential liability of four times its policy limits without receiving any additional consideration. We conclude that absent an express assurance otherwise, it would be unreasonable to assume that the insurers had agreed to be jointly responsible for the entire settlement.[4]

There is also evidence in the record indicating that it is customary shorthand, in this type of settlement negotiation, to refer to the total figure, without specifying that the primary insurer is liable only to the extent of its coverage and the excess insurer is liable only for the remainder. In this regard Moore testified, when asked why the division of obligations among primary and excess carriers is assumed rather than explicit:

There's nothing to assume. It doesn't have to be explicit. It's just plain simply the facts. Excess pays over and above the primary.

. . . . .

It's explicit to me, having done it for many years. I didn't have any doubts as to what it meant, if that's what you're saying. But if we were teaching you a

course on insurance, I suppose he could say that you will pay a total of $250,000 and the primary will pay what it is obligated to pay and the excess will pay the difference.

It is not unreasonable to draw the inference that Kelly, a personal injury attorney experienced in insurance matters, should have been aware of the custom surrounding such negotiations.

Hamrick further argues that there is a presumption that when two or more persons undertake a contractual obligation, they undertake it jointly, citing Restatement (Second) of Contracts § 288 (1981). Section 288 provides:

1. Where two or more parties to a contract make a promise or promises to the same promisee, the manifested intention of the parties determines whether they promise that the same performance or separate performances shall be given.

2. Unless a contrary intention is manifested, a promise by two or more promisors is a promise that the same performance shall be given.

However, parties need not pronounce literal "words of severance" to manifest an intention to overcome the presumption of joint liability for joint undertakings. *Id.* § 288 comment c. Given the circumstances surrounding the settlement agreement, and the evidence of custom in negotiating such settlements, we conclude the presumption was overcome in this case.[5]

AFFIRMED.

MOORE, J., not participating.

---

4. It certainly would be unreasonable to assume that only Northwestern, and not Interstate, was liable for the full settlement amount.

5. *See Douglas v. Berger,* 94 Cal.App.2d 210 P.2d 727, 730 (1949), where the court described a similar statutory presumption as "the weakest and least satisfactory character of evidence."