STATE of Alaska, United Liability Insurance Company, Midland Insurance Company and Alaska Pacific Assurance Company, Appellants,

v.

UNDERWRITERS AT LLOYDS, LONDON, who are members of Syndicate Nos. 48, 140, 800, 402, 942, 53, 960, 97, 595, 950, 295, 256, 312 of the list of underwriting members of Lloyds numbered 1975/8; the British Aviation Insurance Co., Ltd.; Cornhill Insurance Co., Ltd.; Sovereign Marine & General Insurance Co., Ltd.; Drake Insurance Co., Ltd.; Aviation & General Ins. Co., Ltd.; Phoenix Assurance Co., Ltd.; Orion Insurance Co., Ltd.; Scottish Lion Ins. Co., Ltd.; Commercial Union Assurance Co., Ltd.; Excess Insurance Co., Ltd.; Aviation and General Insurance Company Limited; Highlands Insurance Company Limited; London Edinburgh General Insurance Company Limited; American Home Assurance Company and those underwriters at Lloyds and insurance companies subscribing to the insurance policy(s) excess to policy No. 576/AK 90367, Appellees.

No. S–1909.

Supreme Court of Alaska.

May 6, 1988.

Rehearing Denied June 23, 1988.

Lloyd B. Ericsson, Timothy E. Miller, and
Robert J. Ericsson, Martin, Bischoff, Tem-

pleton, Biggs & Ericsson, Anchorage, for
appellants.

Katherine B. Posner, Condon & Forsyth,
New York City, and Rand Dawson, Anchor-
age, for appellees.

Before MATTHEWS, C.J., and
RABINOWITZ, BURKE, and
COMPTON JJ.

## OPINION

MATTHEWS, Chief Justice.

This appeal raises the question whether
an airline's premises-operations insurance
provides coverage for a taxiway accident.

## I. INTRODUCTION

In 1975, a Boeing 747 aircraft owned by
Japan Airlines (JAL) was damaged when it
slid off an icy taxiway at Anchorage Inter-
national Airport. The cost of repairing the
aircraft was nearly $20 million. JAL and
its property insurers sued the State of
Alaska, the owner of the airport, claiming
that the accident resulted from the faulty
design and maintenance of the taxiway.[1]
The state tendered its defense to JAL's
liability insurers, but the tender was re-
fused.[2] Following a trial on the question
of liability, the jury found that the state
was 80% responsible for the accident, and
that JAL was 20% responsible. The state
settled with JAL and its property insurers
prior to entry of final judgment.

At the time of the taxiway accident, JAL
was the named insured under a policy is-
sued by the Underwriters at Lloyds, Lon-
don. The state was an additional insured
under the policy. In the instant case, the
state and its liability insurers seek a decla-
ration that the Underwriters provided lia-
bility insurance for the state which covered
the accident, and a money judgment for a
share of defense and settlement costs.[3]

1. *See Japan Air Lines v. State*, 628 P.2d 934,
935–36 (Alaska 1981).

2. *State v. Appleton & Cox, Inc.*, 703 P.2d 413, 414
(Alaska 1985).

3. The state originally brought this action against
Tokio Marine and Fire Insurance Company and

Appleton & Cox of California, Inc. The state
settled with Tokio and the trial court granted
summary judgment in favor of Appleton & Cox.
Before the state appealed the resulting judgment
it moved to amend its complaint by adding the
Underwriters at Lloyds. *See Appleton & Cox*,
703 P.2d at 414 & n. 1. This motion was grant-
ed by the trial court after the notice of appeal

Both parties moved for summary judgment on the question of coverage. The trial court granted the Underwriters' motion and denied that of the state. A final judgment dismissing the state's claims was entered and this appeal followed.

## II. AIRPORT LEASES AND INSURANCE POLICY PROVISIONS

At the time of the accident, JAL had leased from the state eight areas at Anchorage International Airport for its ticket counter, gate, baggage, and office operations. Each of the leases were substantially identical with regard to applicable covenants and conditions. The leases contained a clause requiring JAL to indemnify, defend, and save harmless the state from claims arising in connection with JAL's use of the leased premises.[4] In addition, the leases contained a paragraph requiring JAL to maintain insurance protecting the state against comprehensive public liability, products liability and property damage.[5]

In compliance with the insuring clause of the leases, JAL furnished the state with a

Certificate of Insurance on a state-supplied form. The certificate described the insurer as "Appleton & Cox/Lloyds, London,"[6] noted that the limits of liability were *at least* $50,000 per accident for property damage, and described the State of Alaska as an additional insured.

The policy to which the certificate refers was issued to JAL by the Underwriters. It applies to JAL and additional insureds from numerous places in the United States and Canada. The insuring agreement states in part:

> The Insurers hereby agree with the Insured, named in the declarations, ...

### INSURING AGREEMENTS

COVERAGE B—PROPERTY DAMAGE LIABILITY. To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by an occurrence and arising out of the hazards hereinafter defined.

> The Tenant shall at its own expense, maintain and keep in force during the term of this lease, adequate insurance to protect both the State and the Tenant against comprehensive public liability, products liability (where applicable) and property damage, in no less than the following amounts:
> (a) Property damage arising from one accident or other cause in a sum of not less than $50,000.00.
> (b) Personal injury or death; liability insurance not less than $100,000.00 per person and $300,000.00 per accident.
> The Tenant shall deposit with the State, a copy or copies of such insurance policy or policies or a certificate of such insurance coverage together with appropriate evidence that the premiums thereupon have been paid. All such insurance of the Tenant shall name the State as an additional assured, contain a waiver of subrogation endorsement, and provide that the State shall be notified at least thirty (30) days prior to any termination, cancellation, or material change in such insurance coverage.
> Such requirement for insurance coverage shall not relieve the Tenant of any of its obligations under this agreement.

was filed. The Underwriters unsuccessfully moved to dismiss the complaint on the ground that the court lacked authority to grant the motion to amend the complaint after the notice of appeal was filed. On appeal, the Underwriters do not argue that the motion to dismiss should have been granted as a basis for upholding the judgment. *See Demoski v. New*, 737 P.2d 780, 786 (Alaska 1987); *Ransom v. Haner*, 362 P.2d 282, 285 (Alaska 1961) (appellee may urge any matter appearing in the record in defense of the judgment even if it was rejected by the trial court).

4. A typical clause read:
> The Tenant [JAL] shall assume liability for damage to property of, or personal injury to, its directors, officers, agents, employees, invitees and guests arising out of, or in connection with, the Tenant's use of the leased premises; and the Tenant shall indemnify, defend and save harmless the State from any and all claims, suits, losses, damages, damage to property, and injuries to persons, of whatsoever kind or nature, arising from actions of the Tenant in the conduct of its operations on the leased premises made available to the Tenant hereunder, or resulting from carelessness, negligence, or improper conduct of the Tenant or any or [sic] its directors, officers, agents, employees, invitees or guests.

5. One such paragraph states:

6. This description of Appleton & Cox as the insurer was a mistake made by JAL's broker. *See Appleton & Cox*, 703 P.2d at 414–15.

The section entitled "Definition of Hazards" reads in part:

*Division 1*—Premises—Operations.

The ownership, maintenance or use of all buildings and/or premises utilized by Japan Air Lines personnel in the scope of their employment by Japan Air Lines and/or for which Japan Air Lines are responsible, and all airport and airline operations necessary or incidental thereto.

The policy expressly excludes hazards related to certain aircraft:

THIS POLICY DOES *NOT* APPLY:

(a) Under Division 1 of the Definition of Hazards, to (1) any aircraft owned by, hired by or for, or loaned to the Insured or to any aircraft in flight by or in the interest of the Insured....

The limit of liability for property damage under the premises operations division of the policy is $1 million for each occurrence.

The policy also contains a cross-liability clause which states:

The inclusion of more than one corporation, person, organization, firm or entity as insured under this Policy shall not in any way affect the rights of any such corporation, person, organization, firm or entity as respects any claim, demand, suit or judgment made, brought or recovered by or in favour of any other Insured, or by or in favour of any employee of such other Insured, this Policy shall protect each corporation, person, organization, firm or entity in the same manner, as though a separate Policy had been issued to each: but nothing herein shall operate to increase the Insurers' liability as set forth elsewhere in this Policy beyond the amount or amounts for which the Insurers could have been liable if only one person or interest had been named as Insured.

Finally, the policy includes a "severability of interests" clause which states that: "[t]he term 'the Insured' is used severally and not collectively."

### III. ANALYSIS

The state argues that coverage exists because the taxiway where the accident occurred is a premise utilized by JAL personnel in the scope of their employment or, in the alternative, that taxiing the airplane was an airline operation necessary or incidental to the use of the leased premises. The state contends that the policy exclusion for aircraft operations does not apply because the state did not own, rent, borrow, or fly the aircraft.

The Underwriters raise four objections to a finding that coverage exists. First, they argue that the policy coverage extends only to risks which arise out of JAL's operations or activities on the leased premises. Second, they contend that there must be a causal connection between JAL's operations and the occurrence giving rise to liability and that such a connection is lacking in this case. Third, the Underwriters argue that the aircraft exclusion applies. Fourth, independent of the policy language, the Underwriters argue that coverage for the taxiway accident was not within the expectation of the parties.

The trial court generally agreed with the Underwriters. We conclude that coverage exists.

First, premises operations coverage is not narrowly confined to accidents occurring on the insured premises. For example, in *Hale v. Fireman's Fund Insurance Co.*, 731 P.2d 577, 579–80 (Alaska 1987), we ruled that a premises-operations liability provision which insured "all operations necessary or incidental" to the use of a produce stand provided coverage for an accident which occurred at a location well away from the premises while produce which was destined for the stand was being unloaded for the purposes of storage. We indicated that unloading at the separate location was either necessary or incidental to the "course of the produce stand business" and thus the insuring language applied.[7]

---

**7.** We nevertheless upheld the summary judgment for the insurer on the ground that the accident fell within an express policy exclusion. 731 P.2d at 580–81.

In the instant case, we conclude that taxiing aircraft is an operation necessary to JAL's use of the leased premises. An airline cannot sell tickets or board passengers without taxiing aircraft. The trial court opined that taxiing was a central activity of an airline; therefore, it could not be considered "incidental" to the airline's indoor terminal activities. However, this reasoning does not preclude coverage since the hazards definition applies to airline operations which are "necessary" as well as those which are merely incidental.

Second, the causation requirement is met since the hazard was the taxiing operation from which the accident arose. The fact that the state's negligence was a cause of the accident in no sense negates coverage, since the purpose of liability insurance is to cover acts of negligence.

Third, we conclude that the aircraft exclusion does not apply. The exclusion applies only to an aircraft owned by, hired by, or loaned to the "Insured." The cross-liability clause requires that we read the policy "as though a separate policy had been issued to each" insured. *See Marwell Constr. v. Underwriters at Lloyds, London*, 465 P.2d 298, 305 (Alaska 1970) ("We hold that the term 'the insured' in the exclusions refers to the person actually seeking coverage."). The state is the entity seeking coverage; it did not own, hire, borrow or operate the aircraft. Therefore, the aircraft exclusion does not apply.

Finally, the Underwriters' argument that the policy did not cover the accident because it was beyond the reasonable expectations of the parties is invalid for the following reasons. The insurance policy which JAL chose to satisfy the insuring requirements of the leases supplied coverage that was broader than that called for in the leases. This may have been convenient from JAL's standpoint, because JAL was able to use the same policy it used elsewhere, rather than buy a special policy applicable only to Anchorage International Airport. In any event, there is nothing in the policy which limits its coverage to the minimums required under the leases and no legal doctrine imposes such a limit.[8]

The obligation of a liability insurer is contractual and is generally determined by the terms of the policy. 6B J. Appleman, *Insurance Law and Practice* § 4254, at 24–25 (Buckley ed. 1979). "The intention of the parties as to the coverage of a policy is determined by the words which they have used." *Id.* However, an insurance policy is a contract of adhesion and, as such, it will be construed according to the "principle of reasonable expectations." *Id.* at 25; *see Stordahl v. Government Employees Ins. Co.*, 564 P.2d 63, 65–66 (Alaska 1977). The reasonable expectations doctrine has been expressed by a leading commentator as follows:

> The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.

R. Keeton, *Basic Text on Insurance Law* § 6.3(a), at 351 (1971). This rule has no application in this case because the policy in question does not contain terms which negate coverage. The general rule that a policy covers what its terms say it covers governs this case.

The judgment is REVERSED and this case is REMANDED for further action consistent with this opinion.

MOORE, J., not participating.

---

**8.** *Cf. MacClellan v. General Casualty & Sur. Co.*, 4 N.J.Misc. 926, 134 A. 911 (Sup.1926), *aff'd*, 103 N.J.L. 702, 137 A. 917 (1927) (that insurer obligated itself to broader coverage than statute called for is not a defense to an action on the policy).