**ALASKA RURAL ELECTRIC COOPER-
ATIVE ASSOCIATION, INC.,**
Appellant,

v.

**INSCO LIMITED, Appellee.**

**No. S–3068.**

Supreme Court of Alaska.

Jan. 26, 1990.

David G. Berry, Kemppel, Huffman & Ginder, P.C., Anchorage, for appellant.

Sanford Kingsley, LeBoeuf, Lamb, Leiby & MacRae, and Mark A. Sandberg, Camarot, Sandberg & Smith, Anchorage, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, COMPTON and MOORE, JJ.

OPINION

MOORE, Justice.

This appeal presents the issue whether an excess insurance carrier is obligated to "drop down" and provide primary coverage when the primary carrier becomes insolvent. This is an issue of first impression in Alaska.[1] Because we do not believe that

---

1. This court, however, has considered similar issues. *See Hamrick v. Shishaldin Fisheries, Inc.,* 708 P.2d 705, 707 (Alaska 1985) (excess insurer not obligated to pay primary insurer's portion of settlement following insolvency of primary insurer); *Providence Wash. Ins. Co. of Alaska v. Alaska Pac. Assur. Co.,* 603 P.2d 899, 903 (Alaska 1979) (coverage under excess policy

insolvency of the primary carrier is one of the risks considered in determining an excess carrier's premium, we hold that an excess insurer is not required to drop down upon insolvency of the primary insurer absent policy language to the contrary. We also hold that the language of the insurance policy in this case does not alter the excess carrier's obligations.

## I. Facts and Proceedings

The Alaska Rural Electric Cooperative Association, Inc. ("ARECA") is a non-profit association of rural electric cooperatives. In 1980, ARECA purchased liability insurance for its various members from Ambassador Insurance Company ("Ambassador") and INSCO Limited ("INSCO"). Matanuska Electric Association, Inc. ("MEA") was a member of ARECA in 1980 and participated in the purchase of insurance. MEA was self-insured for the first $100,000 per occurrence. Ambassador was the primary carrier with an obligation to defend and indemnify MEA for $900,000 per occurrence in excess of the $100,000 self-insured retention ("SIR"). The premium for this policy for all ARECA members was $150,-000. INSCO provided MEA with $9,000,-000 in coverage per occurrence in "excess of $900,000 excess of $100,000 SIR." The premium for the INSCO Policy for all ARECA members was $43,992.

In 1980, MEA made two claims arising from a single event that exceeded its SIR by a combined total of approximately $205,-000. Normally, Ambassador would have paid these amounts in excess of the SIR. However, Ambassador went into receivership in 1983 and was liquidated in 1987. ARECA then demanded that INSCO drop down and cover the deficiency left by Ambassador's insolvency. INSCO refused the demand, and ARECA filed a complaint seeking declaratory relief on April 24, 1987. On May 3, 1988, INSCO moved for summary judgment on the issue of its obligation to drop down. ARECA filed an opposition and cross-motion for summary judgment on May 23, 1988.

On July 15, 1988, the superior court, Judge Milton M. Souter, heard both cross motions. The court entered summary judgment for INSCO holding that as an excess carrier it did not have a duty to assume the insolvent primary carrier's obligations. On September 27, 1988, the court entered final judgment. ARECA appeals.

## II. Does an Excess Insurer Have a Duty to Drop Down and Assume the Obligations of the Primary Insurer When the Primary Insurer Becomes Insolvent?

We have held that "an insurance policy is a contract of adhesion and, as such, it will be construed according to the 'principle of reasonable expectations.'" *State v. Underwriters at Lloyds*, 755 P.2d 396, 400 (Alaska 1988). "The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." *Id.* (quoting R. Keeton, *Basic Text on Insurance Law* § 6.3(a), at 351 (1971)).

■ Both parties agree that at the time they entered into this agreement neither party anticipated the insolvency of the primary carrier Ambassador. ARECA argues that it reasonably expected that by purchasing insurance from Ambassador plus excess insurance from INSCO it would never be faced with a loss in excess of its SIR of $100,000. From this premise, ARECA concludes that its purchase of excess coverage from INSCO protected it from all losses over $100,000 except those paid by Ambassador.

We disagree. Excess coverage policies have relatively low premiums because excess insurers are only obligated to pay claims to the extent they exceed the amount of primary coverage. INSCO's premium for providing excess insurance for all of ARECA's members was $43,992. Ambassador's premium was $150,000. Given these premiums, ARECA's expectation that INSCO would cover losses down to ARECA's SIR if Ambassador became insol-

not triggered where settlement was within limits    of primary policy).

vent is not objectively reasonable. The majority of courts addressing this issue agree.[2]

It is not unfair to leave the risk of insolvency with the insured since the insured selected the primary carrier. INSCO should not bear the risk of insolvency of a carrier it did not choose. If INSCO was required to investigate Ambassador's financial condition before writing its policy, it probably would have charged a higher premium.

We hold that absent policy language to the contrary, an excess insurer is not required to drop down and provide primary coverage when the primary insurer becomes insolvent.

III. Does the Language of the INSCO Policy Require INSCO to Drop Down and Assume Ambassador's Obligations If Ambassador Became Insolvent?

■ Even though INSCO has no duty under the doctrine of reasonable expectations to drop down and provide primary coverage in case Ambassador became insolvent, INSCO may have assumed that obligation in its insurance policy. INSCO's obligation to indemnify each ARECA member is set forth in Endorsement No. 9 to the policy. The endorsement states, in pertinent part:

Limits of Liability Endorsement

It is hereby understood and agreed that the limits of liability and annual premium charges are shown by entity as follows. It is further understood and agreed that the limits shown below are all excess of $900,000 excess of $100,000 S.I.R.

| | Limits of Liability | Premium |
|---|---|---|
| .... | | |
| Matanuska Electric Association | $9,000,000 | $11,555 |

(Emphasis added). We find there is no ambiguity in this language. INSCO's obligation to pay is triggered only after MEA has incurred $1,000,000 in loss.

ARECA, however, argues that the clear language of Endorsement No. 9 providing that INSCO's coverage is in excess of the primary carrier's liability conflicts with the general terms of the insurance coverage agreement:

LIMIT OF LIABILITY. The Company shall only be liable for the ultimate net loss in excess of the self insured retention stated in the declarations in respect of each occurrence and then only up to a further limit as stated in the declarations in respect of each occurrence subject to a limit as stated in the declarations in the aggregate for each annual period during the currency of this policy, commencing from the effective date.

Self-insured retention is defined by the policy as "the amount of the 'ultimate net loss' payable by the Insured in respect of each occurrence." Ultimate net loss is defined as "the total sum which the Insured becomes obligated to pay by reason of personal injury, property damage or advertising claims...."

ARECA infers from these provisions that the policy requires INSCO to be liable for the amount ARECA becomes obligated to pay by reason of personal injury, property damage, or advertising claims in excess of $100,000. ARECA argues that this amount will vary depending on whether coverage is afforded by the primary insurer.

■ We disagree. Endorsement No. 9 expressly modifies the policy's printed terms. As we held in *State v. Oriental Fire & Marine Ins. Co.*, 776 P.2d 776, 779 (Alaska 1989), "where the provisions of an effective endorsement conflict with those of the insurance policy, the endorsement controls."

**2.** *See, e.g., Maricopa County v. Federal Ins. Co.,* 157 Ariz. 308, 757 P.2d 112, 114 (App.1988) ("An insured pays a reduced premium to the excess carrier expressly because that carrier will be obligated to pay a claim only after a certain amount has been paid by the primary carrier."); *Seaway Port Auth. v. Midland Ins. Co.,* 430 N.W.2d 242, 249–50 (Minn.App.1988) ("Imposing primary coverage on the excess insurer would 'transmogrify the excess policy into one guaranteeing the solvency of whatever primary insurer the insured might choose.' "); *Rapid City Regional Hospital, Inc. v. South Dakota Ins. Guar. Ass'n,* 436 N.W.2d 565, 567 (S.D.1989).

ARECA also relies on the "other insurance" clause in the policy to support its contention that INSCO is obligated to drop down. This clause provides as follows:

> OTHER INSURANCE. If other valid and collectible insurance, which is written by another insurer is available to the Insured covering a loss also covered by this policy, other than insurance that is in excess of this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance.

ARECA argues that the Ambassador policy is "other insurance" that is not "valid and collectible" under the policy, and therefore that INSCO must cover all liability over the $100,000 SIR. ARECA relies on *McGuire v. Davis Truck Services, Inc.*, 518 So.2d 1171 (La.App.1988), *cert. denied*, 526 So.2d 791 (La.1988) for the proposition that the use of the term "collectible" in an other insurance clause creates an ambiguity as to whether the excess insurer must drop down upon insolvency of the primary insurer. In *McGuire*, the excess insurer limited its liability to "the ultimate net loss the excess of ... the *amount recoverable* under the underlying insurers." 518 So.2d at 1172 (emphasis in original). The court relied on the policy's use of the term "collectible" in the other insurance clause only to support its interpretation of the term "recoverable" in the limit of liability clause above. 518 So.2d at 1174. It is this language that led the court to condition the excess insurer's liability on the amount recoverable from the primary insurer. *Id.*

*McGuire*, therefore, is not relevant to this case since in INSCO's policy the term "collectible" is found, not in the limit of liability clause, but in the "other insurance" clause. We choose to follow numerous other courts in holding that the presence of the term "collectible" in an other insurance clause does not create an ambiguity as to the excess insurer's coverage in case of the primary insurer's insolvency.[3] These courts recognize that the "other insurance" clause is a standard provision intended to limit the excess insurer's liability in the event that insurance other than the scheduled underlying insurance is available to the insured. Since Ambassador's insurance is not "other insurance," the clause is not applicable.

Considering the policy as a whole, and in particular, the language of Endorsement No. 9, we conclude that there is no ambiguity as to whether INSCO would provide primary coverage to ARECA in case of Ambassador's insolvency. INSCO is obligated to provide coverage for a loss only in excess of $1,000,000. Therefore, the judgment of the superior court is AFFIRMED.

BURKE, J., not participating.

**3.** *See, e.g., Mission Nat'l. Ins. Co. v. Duke Transp. Co.,* 792 F.2d 550, 554 (5th Cir.1986) (applying Louisiana law) ("[O]ther valid and collectible insurance" refers to insurance other than the scheduled underlying insurance, and "the use of the term 'collectible' in no way refers to the [primary policy]."; *United States Fire Ins. Co. v. Coleman,* 754 S.W.2d 941, 943–44 (Mo.App.1988) (use of "other collectible insurance" in other insurance clause does not create ambiguity requiring "drop-down" by excess insurer); *Pergament Distribs., Inc. v. Old Republic Ins. Co.,* 128 A.D.2d 760, 513 N.Y.S.2d 467, 469 (N.Y.App. Div.) (use of the term "other valid and collectible insurance" in other insurance clause does not create ambiguity requiring "drop-down" by excess carrier), *appeal denied,* 70 N.Y.2d 607, 519 N.Y.S.2d 1031, 514 N.E.2d 389 (1987).