Christopher FULTON, individually and as assignee of Walter E. Clark, Appellant and Cross–Appellee,

v.

LLOYDS AND INSTITUTE OF LONDON UNDERWRITING COMPANIES, including John Crawley, individually and as representative on behalf of certain underwriters at Lloyds of London subscribing to Policy No. BH0150TAA, Excess Insurance Company, Ltd.; London & Hull Maritime Insurance Co., Ltd.; Cornhill Insurance PLC 'M' A/C; Insurance Company of North America 'G' (UK); The Prudential Group 9; and The Baltica (UK) JA; and Property Marine, Appellees and Cross–Appellants.

Nos. S–6284, S–6334.

Supreme Court of Alaska.

Oct. 6, 1995.

Randall E. Farleigh, Farleigh & Shamburek, Anchorage, for Appellant and Cross–Appellee.

Brewster H. Jamieson, Diane L. Wendlandt, Lane Powell Spears Lubersky, Anchorage, for Appellees and Cross–Appellants.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

MATTHEWS, Justice.

This dispute over insurance coverage for an accident at sea comes to us after the conclusion of suits in state and federal courts and while liquidation proceedings for one insurer are underway in the State of Washington. The findings of the trial court guide us through the maze:

## FINDINGS OF FACT[1]

### I. THE INJURY

1. In early January 1986, the fishing vessel JAMIE LYNN set out from Cordova, Alaska, toward the Alaska Peninsula. On board were captain Christopher Clark and crew member Christopher Fulton, plaintiff in this action.

2. The vessel stopped in Kodiak to pick up crabbing gear and to fish for tanner crab, and Clark hired Dennis Carlsen and Karl Steen to join the crew.

3. The JAMIE LYNN subsequently stopped in Cold Bay, where welder Brian Shaw came aboard to do some repair work. When the vessel left Cold Bay, Clark retained Shaw to help with the crabbing, raising the crew complement to four.

4. Sometime during the beginning of March, 1986, the JAMIE LYNN passed north through the Aleutian Islands and headed toward the Pribilof Islands to fish for opilio crab.

5. Along the way, the crew dropped its load of about 100 crab pots in strings between a half mile and ten miles long.

6. Exactly where the crab pot strings were placed is unclear from the evidence presented to the court, but the strings were at depths of 60 to 90 fathoms in areas between approximately 166 to 169 degrees west longitude, 55 to 56.5 degrees north latitude. This region lies to the south and east of St. George Island, in the Bering Sea.

7. After the pots were dropped, a storm blew in and the JAMIE LYNN sought shelter at St. Paul Island, northwest of the area where the crab pot strings were located. The vessel remained at St. Paul for several days.

8. When the storm abated somewhat, the JAMIE LYNN set out to find and check the strings.

9. On March 9, 1986, the vessel was searching for the strings when plaintiff [Christopher Fulton] slipped and fell, apparently on a loose pipe fitting that had dropped from a bin onto the floor of the engine room.

10. At the time, the wind was blowing at approximately 25 to 50 knots and raising eight- to twelve-foot swells.

11. The exact location of the JAMIE LYNN at the time of plaintiff's injury is an issue of dispute between the parties, but the crew believed the vessel to be in close proximity to the crab pot strings, about 14 to 16 hours from St. Paul Island.

12. Upon determining that plaintiff had injured his back in the fall, Clark turned the vessel about and headed back to St. Paul Island, where the Coast Guard took plaintiff from the JAMIE LYNN to a clinic on shore.

13. The clinic placed a telephone call to Walter Clark, the owner of the vessel, informing him of the situation. Walter Clark arranged to have plaintiff transported by airplane to Anchorage, and then by ambulance to Providence Hospital. After ten days in the hospital, plaintiff returned to Cordova.

14. Plaintiff has since undergone other medical treatment for his injury, and has accrued medical expenses and other damages that are the basis of this lawsuit.

### II. THE POLICY

15. Beginning in 1984, Walter Clark obtained a $500,000 protection and indemnity (P & I) insurance policy for the JAMIE LYNN through his broker, Northern Marine Insurance (hereinafter "NMI").

16. The 1984–1985 policy provided, among other things, that the warranted vessel would be engaged in "the tendering and possible halibut longline fishing industry"; that the vessel would be "confined to the waters of Bristol Bay and waters surrounding the Alaska Peninsula, and connecting waters to Cordova"; and that a maximum of three crew members would be aboard the vessel, with any increase over this amount to be reported "immediately upon being advised or aware of same." The policy further provided that the JAMIE LYNN would be laid up between October 1 and April 1.

1. Footnotes and record citations have been omitted.

17. At the time the policy was entered into, Walter Clark indicated to Francis Zemp, solicitor for NMI, that he did not intend for the policy to cover use of crab pot gear.

18. On September 25, 1985, Zemp contacted Walter Clark about renewing the P & I policy for another year. While discussing the renewal with Clark, Zemp marked a renewal application form to indicate no changes to the policy.

19. The actual renewed policy was substantially identical in its provisions to the 1984–1985 policy, with an exception being an amendment to allow the JAMIE LYNN to leave port as of January 1, rather than April 1, although the crew warranty was limited to the period from January 1 to July 1. Additionally, the renewed policy contained a clause requiring certain conditions to be met and maintained during the course of the policy "in the event the vessel engages in crab fishing."

20. Property Marine, from whom NMI sought to obtain the necessary endorsements for the Clark policy, arranged for Pacific Marine Insurance Co. (hereinafter "Pacific Marine") to cover the first $200,000 of the policy and defendant in this case Lloyds and Institute of London Underwriting Companies (hereafter "Lloyds") to provide the additional $300,000 in excess insurance.

21. The renewed P & I policy extended from November 11, 1985, to November 11, 1986. On January 21, 1986, NMI received an endorsement to the policy with a new subscription page stamped with the words "WARRANTED NO CRABBING." NMI never forwarded the amended subscription page to Walter Clark.

### III. *THE COVERAGE DISPUTE*

22. Hoping to resolve the matter without recourse to the insurance policy, Walter Clark did not immediately report Fulton's injury to NMI.

23. In April 1986, Clark obtained an endorsement from Pacific Marine, through NMI, reading:

EFFECTIVE 11TH APRIL, THROUGH MAY, IN CONSIDERATION OF ADDITIONAL PREMIUM $3,450. IT IS UNDERSTOOD AND AGREED TO PERMIT THE "JAMIE LYNN" TO ENGAGE IN CRABBING OPERATIONS WITHIN AND AROUND THE PRIBILOF ISLANDS WITH THREE CREW.

24. Clark had paid $9,600 for the renewed P & I policy, which covered a period of six months of fishing operations for the JAMIE LYNN with a crew. Representatives of NMI and Property Marine testified that the high additional premium paid by Clark for a crabbing period of approximately a month-and-a-half reflected the unusual risk attendant with that particular kind of fishing.

25. On July 24, 1986, Walter Clark provided general information about Fulton's injury to Zemp at NMI. In a letter with the same date, NMI alerted Property Marine to the "possible claim." In a memorandum dated August 4, 1986, Property Marine notified Pacific Marine of the claim.

26. Pacific Marine assigned adjustor Christine Bottomley to the claim on August 12, 1986. On August 20, 1986, having recognized a potential coverage problem, Bottomley prepared but did not send a reservation of rights letter to Walter and Christopher Clark. On the same day, Bottomley called Christopher Clark and told him that coverage could be a problem.

27. On August 26, 1986, Pacific Marine held an internal meeting at which it was decided that Pacific Marine's defense should be assigned to Paul Daigle, an attorney, and that another reservation of rights letter should be drafted. Also on August 26, 1986, plaintiff in the present case filed an action in rem against the JAMIE LYNN and in personam against Christopher Clark, asking for damages arising from plaintiff's injury.

28. On September 4, 1986, Daigle hired George Barnum to investigate the claim for Pacific Marine. Barnum conducted interviews between September 12 and September 19, 1986 with Walter Clark and the crew of the JAMIE LYNN.

29. On September 8, 1986, Walter Clark notified Pacific Marine that he had retained attorney Michael Schneider to represent him on the claim. On September 12, 1986, Walter Clark telephoned Linda Pysher, Bottomley's supervisor at Pacific Marine, and told her that Christopher Clark had been served with notice of a pre-arrest hearing to be held on September 16, 1986. When Clark indicated that he could not reach Schneider, Pysher suggested that Pacific Marine provide attorney Robert Richmond to represent him at the hearing. On September 15, 1986, Pacific Marine contacted Richmond about representing the JAMIE LYNN and the Clarks on the claim. Beginning the following week, Walter Clark and Richmond entered into correspondence regarding the case.

30. Richmond appeared on behalf of the Clarks at the pre-arrest hearing, after which a warrant for the arrest of the JAMIE LYNN was issued. To avoid arrest, Christopher Clark fled with the JAMIE LYNN. The vessel and its crew were lost at sea during the flight.

31. On September 22, 1986, counsel for Pacific Marine sent a reservation of rights letter to the Clarks. Lloyds sent a letter dated October 15, 1986, notifying the Clarks that Lloyds would provide excess coverage only if Pacific Marine decided to extend primary coverage.

32. On October 6, 1986, Pacific Marine filed a declaratory judgment action in the federal district court against the Clarks, asking for a determination of coverage. Plaintiff in the present case intervened in the suit.

33. Judge Fitzgerald held a two-week bench trial, at the conclusion of which he found for Pacific Marine on the grounds that the JAMIE LYNN had been engaged in crabbing in the Bering Sea at the time of Fulton's injury, in violation of policy warranties. Judge Fitzgerald also rejected the argument that Pacific Marine was estopped from raising the warranties as a defense by reason of its actions in handling the claim. Final judgment was entered against the Clarks and Fulton on September 7, 1988.

34. The defendants appealed the district court's decision to the United States Court of Appeals for the Ninth Circuit. During the course of the appeal, Pacific Marine went into liquidation, approved Fulton's claim despite the district court's decision, and decided not to file a brief to the Ninth Circuit.

35. Pacific Marine then inquired whether Lloyds wished to pay the costs of preparing and filing an appellate brief. Lloyds chose not to accept Pacific Marine's offer.

36. On September 25, 1991, the Ninth Circuit determined that the case was moot, vacated the district court's decision, and remanded with directions to dismiss.

37. Meanwhile, Fulton's suit against the JAMIE LYNN, Walter Clark, and the estate of Christopher Clark was resolved in the fall of 1988 when the defendants in that case assigned to Fulton their causes of action against their insurers in exchange for a covenant by Fulton not to execute on a judgment against the Clarks, and subsequently the Clarks confessed judgment in favor of Fulton in the amount of $450,000. The assignment provided an exception that Fulton would be allowed to execute against assets of the estate of Christopher Clark conveyed to Walter Clark.

38. On March 5, 1992, Fulton filed the present suit against Lloyds and Institute of London Underwriting Companies and Property Marine, realleging the same causes of action raised in *Pacific Marine v. Clark.*

In the present case, Fulton alleges that Pacific Marine committed various acts in connection with its defense of the Clarks which precluded Pacific Marine from denying coverage for Fulton's accident.[2] Fulton filed a

---

2. The allegations of wrongful conduct on the part of Pacific Marine are that it "elected to deny coverage to the Clarks ... while failing to notify the Clarks of said intent to deny coverage until after [Pacific Marine] had obtained interviews of the Clarks and information therefrom favorable to [Pacific Marine's] position against the Clarks"; and that when Pacific Marine notified the Clarks of its decision to defend under a reservation of rights to later deny coverage, the Clarks rejected

motion for partial summary judgment seeking a determination that if Pacific Marine would be precluded by its acts in the defense of the Clarks from denying coverage, Lloyds would likewise be precluded. Lloyds opposed the motion and the trial court denied it on the ground that "Pacific Marine cannot be viewed as the agent of [Lloyds].... Because there has been no allegation that [Lloyds], through some kind of consensual arrangement, ever held control over the conduct of Pacific Marine, plaintiff's motion on this issue is DENIED."

Both parties agreed to submit the case to the court on the existing record. At the conclusion of the trial the court held that Lloyds was not estopped from denying coverage based on the lack of an agency relationship between Lloyds and Pacific Marine. The trial court then turned to the various coverage defenses asserted by Lloyds. The court concluded that Lloyds' claim that the no assignment clause in the policy had been breached by Walter Clark's assignment of his claim against Pacific Marine to Fulton, its claim that the no crabbing clause had been violated, and its claim that the crew warranty had been violated, were unavailing. However, the court held that the navigational warranty had been violated in that the JAMIE LYNN was outside of the geographical area described in the policy and that its presence outside of that area "significantly increased the risk that plaintiff would be injured in the way that he was injured" because of the rough water in the Bering Sea. The court concluded that the breach of this navigational warranty voided the policy, and thus entered judgment in favor of Lloyds.

On appeal, Fulton argues that the trial court erred in concluding

(1) that Lloyds was not precluded from denying coverage assuming that Pacific Marine would have been so precluded by its conduct in connection with the defense of the Clarks; and

(2) that the navigation warranty was breached and, assuming such a breach, that the breach significantly increased the risk.

On cross-appeal, Lloyds argues that the trial court erred in

(1) failing to hold that Fulton was collaterally estopped from bringing this case by the federal district court's decision which was subsequently vacated at the direction of the Court of Appeals for the Ninth Circuit;

(2) refusing to enforce the no assignment clause of the policy;

(3) refusing to enforce the no crabbing warranty;

(4) holding that the crew warranty was not breached;

(5) refusing to amend the caption of the case by deleting Lloyds' name;

(6) refusing to hold that the assignment from Walter Clark to Fulton was invalid because it was accompanied by a covenant not to execute;

(7) refusing to admit the statement of Christopher Clark, who was deceased at the time of trial, made to an insurance adjuster as to where the boat was at the time of the accident; and

(8) failing to consider the no crabbing warranty as a part of the navigational warranty.

■ Except for the first point raised by Fulton, we have determined that none of these points is meritorious and we determine them summarily.[3]

this conditional defense but Pacific Marine none-theless proceeded to defend the Clarks.

**3.** The trial court's factual finding as to the location of the boat at the time of the accident and its conclusion that this location was outside of the warranted policy area is not clearly erroneous. The trial court's conclusion that breach of the navigational warranty as to location significantly increased the risk of an accident such as that suffered by Fulton is likewise not clearly erroneous given the finding that the waters of the Bering Sea where the accident occurred are gen-

erally rougher than the areas where navigation was permitted under the policy.

Lloyds' collateral estoppel point lacks merit for it ignores the requirement that the issue which has been already litigated must be final. *Murray v. Feight,* 741 P.2d 1148, 1153 (Alaska 1987). The Ninth Circuit remanded the district court case "with a direction to dismiss. *See United States v. Munsingwear, Inc.,* 340 U.S. 36, 39 [71 S.Ct. 104, 106, 95 L.Ed. 36] (1950)." In *Munsingwear* the United States Supreme Court explained that reversing or vacating judgments as moot and remanding with a direction to dismiss

Fulton argues here, as he did before the trial court, that Lloyds was bound by Pacific Marine's decisions and conduct in defending the Clarks under the policy. Fulton points out that there was only one policy with two subscribing insurer groups, and the policy language concerning the defense obligation under the policy makes no distinction between the subscribing insurer groups. Fulton argues: "As a matter of contract law, the duty to defend and related legal consequences flowing from that duty voluntarily assumed under [the policy] are not divisible when they were not separately addressed or divided between [Lloyds] and Pacific Marine under the policy."

Lloyds' response is that it occupied the same position as would an insurer which issued a policy of excess insurance because the word excess was used in the policy in connection with Lloyds in various endorsements.[4] Lloyds also argues that "[a]lthough

clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance. When that procedure is followed, the rights of all parties are preserved; none is prejudiced by a decision which in the statutory scheme was only preliminary. *Id.* at 40, 71 S.Ct. at 107. The Ninth Circuit's reference to *Munsingwear* makes it plain that this is not an appropriate case for application of the doctrine of collateral estoppel.

Concerning the policy warranties, the trial court correctly required that the breach of such warranties contribute to the injury or increase the risk of the injury. *Highlands Ins. Co. v. Koetje*, 651 F.Supp. 346, 347 (W.D.Wash.1987). *Cf., Estes v. Alaska Ins. Guar. Ass'n*, 774 P.2d 1315, 1318 (Alaska 1989) ("time limit on commencement of suit clauses, notice of loss clauses, proof of loss clauses, and cooperation clauses [in insurance policies] should all be reviewed on the basis of whether their application in a particular case advances the purpose for which they were included").

Lloyds' arguments concerning its policy and coverage defenses, points 2, 3, 4, 5, 6, & 8, and its evidentiary argument, point 7, are moot in view of our determination that the trial court's holding that the navigational warranty was breached and the breach was material must be affirmed. The trial court's determination concerning the navigational warranty will be dispositive unless on remand the court finds that there was a material breach in connection with the defense duties owed the insured which gives rise to an estoppel to rely on policy and coverage defenses. *E.g., Sauer v. Home Indem. Co.*, 841 P.2d 176, 184 (Alaska 1992) ("[I]nsurance company which wrongfully refuses to defend is liable for the judgment which ensues even though the facts may ultimately demonstrate that no indemnity is due."); *Davis v. Criterion Ins. Co.*, 754 P.2d 1331, 1332 (Alaska 1988) (unjustified denial of coverage "put to an end [insurer's] right to demand compliance by the insured with other terms of the agreement."). If such a breach is found, the estoppel will run to all of the policy and coverage defenses asserted. If not, the insured's breach of the navigational warranty is alone sufficient to negate coverage.

Lloyds' argument that its name should have been deleted is erroneous. Lloyds argues that it is "an association of individual insurance companies," rather than an individual insurance company. However, an association may be sued in its common name. Alaska R.Civ.P. 17(b). Further, Lloyds was named as a subscribing company in the insurance policy. If the association did not wish to be treated as an insurance company, it should not have allowed itself to be named as such. *Taggart v. Wachter*, 179 Md. 608, 21 A.2d 141, 146 (1941) ("[C]ourts which have had to deal with [associations of individuals exchanging contracts among themselves] have recognized the necessity of treating them to an extent as entities."); *Thomas Canning Co. v. Canners' Exch. Subscribers at Warner Inter–Insurance Bureau*, 219 Mich. 214, 189 N.W. 214, 219 (1922) ("[A]n action at law against defendant in the associate character and name by which it contracted will lie."); *Mountain Timber Co. v. Manufacturing Wood Workers Underwriters*, 98 Wash. 167, 167 P. 93, 94 (1917) (nothing in policy limited right to sue association under name policy issued).

4. For example, the signature lines for endorsements were written as follows:

---

PACIFIC MARINE INSURANCE/PROPERTY MARINE 100% P & I

---

LLOYDS AND INSTITUTE OF LONDON UNDERWRITING COMPANIES/PROPERTY MARINE 100% EXCESS P & I

---

As another example, the subscription sheet to the policy was divided in three columns; in relevant part it read as follows:

| AMOUNT INSURED | PREMIUM | COMPANY, SIGNATURE AND NUMBER |
|---|---|---|
| $500,000 Protection & | | |

the excess insurance was subject to the same terms and conditions as the primary insurance, it was issued as a separate policy of insurance."

It is our view that Fulton's argument on this point is correct. Only one policy was issued Walter Clark. It is policy number 85–PI–08744 with a limit of $500,000 for which Clark was charged a single premium of $9,600. The lead paragraph of the policy makes it clear that all of the subscribing companies are subject to the terms and conditions of the policy. The paragraph states:

> In consideration of the premium hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure the assured named herein, for the amounts and proportions set opposite their respective names. All are subject to the terms and conditions of the forms and endorsements attached herein[.]

The attached protection and indemnity endorsement states the following with respect to rights and obligations concerning the defense of claims:

> In consideration of the premium and subject to the warranties, terms and conditions herein mentioned, this Company hereby undertakes to pay up to the amount hereby insured....
>
>     . . . .
>
> Costs and expenses, incurred with this Company's approval, of investigating and/or defending any claim or suit against the assured arising out of a liability or an alleged liability of the assured covered by this policy.

Indemnity

. . . .

| Protection & Indemnity agreed % $200,000.00 | $9,600.00 |
|---|---|

. . . .

| Protection & Indemnity agreed % $300,000.00 Excess of $200,000.00 | Included |
|---|---|

. . . .

This Company shall have the option of naming the attorneys who shall represent the assured in the prosecution or defense of any litigation or negotiations between the assured and third parties concerning any claim covered by this policy, and shall have the direction of such litigation or negotiations. If the assured shall fail or refuse to settle any claim as authorized by this Company, the liability of this Company shall be limited to the amount for which settlement could have been made. The assured shall at the option of this Company permit this Company to conduct, with an attorney of this Company's selection, at this Company's cost and expense and under its exclusive control, a proceeding in the assured's name to limit the assured's liability to the extent, and in the manner provided by the present and any future statutes relative to the limitation of a ship owner's liability.

As both Pacific Marine and Lloyds are subscribing companies to the policy, they are both included within the term "this Company." Under the introductory clause of the policy set forth above they are both "subject to the terms and conditions" of the protection and indemnity endorsement.

Policies of insurance are to be construed in accordance with the reasonable expectations of the assured: "The objectively reasonably expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would

PACIFIC MARINE INSURANCE CO./PROPERTY MARINE

by _____
    Policy Number:
    85 PI 08744

LLOYDS AND INSTITUTE OF LONDON UNDERWRITING COMPANIES/PROPERTY MARINE

by _____
    Policy Number
    85 PI 08744

have negated those expectations." *Bering Strait School Dist. v. RLI Ins. Co.*, 873 P.2d 1292, 1295 (Alaska 1994) (quoting Robert Keeton, *Basic Text on Insurance Law* § 6.3(a), at 351 (1971)). To ascertain reasonable expectations "we look to the language of the disputed policy provisions, the language of other provisions of the insurance policy, and to relevant extrinsic evidence. In addition, we refer to case law interpreting similar provisions." *Bering Strait*, 873 P.2d at 1295 (quoting *Stordahl v. Government Employees Ins. Co.*, 564 P.2d 63, 66 (Alaska 1977)).

An insured in the position of Walter Clark reasonably would expect both insurers to be responsible for and bound by decisions made in "the direction" of "litigation or negotiations," given the fact that there was only one policy and that both subscribing insurers had severally undertaken identical duties under the policy. As between the subscribing insurers, there doubtless was some sort of an understanding that Pacific Marine would have initial defense responsibilities. However, such an understanding would do nothing to change the impression conveyed by the language of the policy that there would be only one defense to which both insurers would be bound since there was only one policy.

Our conclusion is consistent with the letter written to the Clarks by Property Marine on behalf of Lloyds shortly after the litigation was commenced. The letter expressed and emphasized Lloyds' view that there was only a single policy rather than separate policies and that Lloyds' liability was dependent on liability of Pacific Marine first being established. The letter stated in part as follows:

> [I]f Pacific Marine, the primary carrier, determines that the referenced loss is covered *and* the value of the claim exceeds their primary limit of $200,000, then London will normally respond up to their excess limit. On the other hand, should the primary carrier prove the loss is not covered, then London will not respond.

I would point out to you that the primary and excess coverage are *not* separate policies, and there can be no recovery from London until, and unless, there is recovery from Pacific Marine.

As noted above, Lloyds argues that it was in the same position that it would have been had it issued a separate policy of excess insurance because the word "excess" was used in connection with Lloyds in various endorsements in the policy. This argument lacks merit. While excess insurers under policies separate from those issued by primary insurers are often not responsible for the defense of a claim against the insured until the limits of the primary policy are exhausted, this is by no means a blanket rule applicable to all of the permutations in which the primary insurer/excess insurer relationship appears, nor is it independent of the particular language of the policies involved. *See, e.g., Signal Cos. v. Harbor Ins. Co.*, 27 Cal.3d 359, 165 Cal.Rptr. 799, 805, 612 P.2d 889, 895 (1980) ("We expressly decline to formulate a definitive rule applicable in every case in light of varying equitable considerations which may arise, and which affect the insured and the primary and excess carriers, and which depend upon the particular policies of insurance, the nature of the claim made, and the relation of the insured to the insurers."); *Guaranty Nat'l Ins. Co. v. American Motorists Ins. Co.*, 758 F.Supp. 1394, 1396 (D.Montana 1991), *aff'd*, 981 F.2d 1108 (9th Cir.1992) (unconditional promise in excess policy to provide a defense binds excess carrier to pro rata defense costs; court "emphasized that the holding in any particular case addressing the issue of allocation of defense costs between primary and excess insurers must be considered in light of the particular facts of each case and the various policies involved."); *cf., Alaska Rural Elec. Co-op. Ass'n v. INSCO Ltd.*, 785 P.2d 1193, 1195 (Alaska 1990) (Excess insurer not required to drop down to provide primary coverage when primary insurer insolvent "absent policy language to the contrary.").[5]

---

5. Lloyds' argument that its undertaking to insure was issued as a separate policy of insurance can most charitably be described as puzzling. The record citations furnished by Lloyds do not demonstrate that a separate policy of insurance was issued, no such policy appears in the record, and the existence of a separate policy would be in conflict with the letter written on behalf of Lloyds set forth above at page 1069.

In summary, Fulton's argument is that Pacific Marine violated certain duties owed by an insurer in the defense of its insured and that both Pacific Marine and Lloyds were estopped from relying on policy and coverage defenses. The superior court did not rule on whether any such violations occurred. Instead it held that the presence of such violations would be irrelevant because they would not bind Lloyds. For the reasons expressed above we find that this conclusion is erroneous. However, we do not express any view as to whether there were material breaches of any defense duties under the policy. This point must be determined on remand.

REVERSED and REMANDED.