ALLSTATE INSURANCE COMPANIES,
Plaintiffs,

v.

Charles HERRON, Defendant

No. A04–0043 DV (JKS).

United States District Court,
D. Alaska.

May 14, 2005.

*ORDER*

SINGLETON, District Judge.

**INTRODUCTION**

Before the Court is Plaintiff Allstate Insurance Companies ("Allstate") motion for summary judgment. *See* Docket Nos.

19 (Mot.); 49 (Opp'n); 69 (Reply). Also ripe for a ruling is Defendant Charles Herron's motion to compel. *See* Docket Nos. 70 (Mot.); 75 (Opp'n); 78 (Reply). As the Court outlined in its July 13, 2005, order denying Herron's motion to decline jurisdiction in light of related state proceedings, Allstate sues Herron for a declaratory judgment that it did not breach its insurance contract with him. Docket No. 20. Herron was sued by Angelina Trailov and her mother, Mary Kenick, the victims of a single car accident in which Herron was the driver. Allstate alleges that Herron breached the cooperation clause of the insurance contract by confessing judgment and assigning his rights to Trailov and Kenick. As the July 13 order outlined the issue,

> It appears that Trailov was injured in a single car accident in which Herron was driving. Kenick allegedly suffered emotional distress when she first observed her injured daughter. In its complaint Allstate alleged that Trailov and Kenick sued Herron, demanding judgment in excess of Allstate's policy limits. Herron then allegedly threatened to confess judgment in favor of Trailov and Kenick and assign his rights against Allstate to them, unless Allstate modified its rights under the insurance policy and promised to pay any excess judgment recovered against him.

*Id.* at 1. Allstate's current motion moves for summary judgment on the issue of whether Herron breached his obligations to Allstate without excuse. Herron responds that Allstate negligently represented him, necessitating his confessing judgment to Trailov and Kenick. In the alternative, Herron asks for additional time to discover facts under Federal Rule of Civil Procedure 56(f) relevant to Allstate's motion. The Court has jurisdiction as the parties are diverse and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332.

## DISCUSSION

### I. Allstate's motion for summary judgment

■ The standards for summary judgment are well settled. Federal Rule of Civil Procedure 56 dictates that "[a] party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may . . . move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed.R.Civ.P. 56(a); *see also* Fed.R.Civ.P. 56(b) (providing the same standard for parties defending a claim). Summary judgment is appropriate if the Court finds that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court will construe all evidence and draw all evidentiary inferences in favor of the nonmoving party. 10A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure* § 2727, at 459 & n. 5 (3d ed.1998) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

A dispute over a "genuine" material fact exists if the evidence would allow a reasonable fact-finder to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247—48, 106 S.Ct. 2505. The nonmoving party may defeat the summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322—23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, mere allegations of factual dispute, without more, will not defeat an otherwise proper motion. *Angel v. Seattle–First Nat'l Bank,* 653 F.2d 1293, 1299 (9th Cir.1981) ("A motion for summary judgment cannot be defeated by mere conclusory allegations unsupported by factual data.").

■ In diversity cases, state law governs interpretation of substantive matters. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78—80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under Alaska law, "[t]he construction of an insurance contract is a matter for the court, unless its interpretation is dependent upon the resolution of controverted facts." *O'Neill Investigations, Inc. v. Ill. Employers Ins. of Wausau,* 636 P.2d 1170, 1173 (Alaska 1981). If a policy is ambiguous, it should be interpreted in favor of the reasonable expectations of the insured. *Bering Strait School Dist. v. RLI Ins. Co.,* 873 P.2d 1292, 1295 (Alaska 1994).

■ "The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." *State v. Underwriters at Lloyds, London,* 755 P.2d 396, 400 (Alaska 1988) (quoting R. Keeton, *Basic Text on Insurance Law* § 6.3(a), at 351 (1971)). The reasonable expectation approach is appropriate "regardless of whether the policy language is ambiguous ... [but] 'is not to be used as an instrument for ignoring or rewriting insurance contracts.'" *Farquhar v. Alaska Nat'l Ins. Co.,* 20 P.3d 577, 579 (Alaska 2001) (quoting *Guin v. Ha,* 591 P.2d 1281,

1285 (Alaska 1979)) (footnote omitted). To interpret the disputed terms of an insurance contract, courts look to "(1) the language of the disputed policy provisions; (2) the language of other provisions in the policy; (3) relevant extrinsic evidence; and (4) case law interpreting similar provisions." *Holderness v. State Farm Fire & Cas. Co.,* 24 P.3d 1235, 1238 (Alaska 2001).

■ In Alaska, "[o]rdinarily, an insured's breach of [a] cooperation clause relieves a prejudiced insurer of liability under the policy." *Grace v. Ins. Co. of N. America,* 944 P.2d 460, 464 (Alaska 1997) (quoting *Arizona Property & Cas. Ins. Guar. Fund v. Helme,* 153 Ariz. 129, 735 P.2d 451, 458—59 (1987)). An insured may breach a cooperation clause by confessing liability in a dispute in which an insurer has a duty to defend. *See Grace,* 944 P.2d at 464. However, such a breach may be excused by the insurer's prior misconduct. *Id.* "Breach of the covenant of good faith and fair dealing exposes the insurer to a claim of bad faith and may expose it to liability for any excess judgment against its insured." *Jackson v. Am. Equity Ins. Co.,* 90 P.3d 136, 142 (Alaska 2004). In other words, if an insurer proceeds in bad faith, it may be exposed to liability and have to pay a judgment in excess of the insurance policy limits even where the insured has breached his obligation to cooperate under that policy.

The parties seem to agree that Herron violated the cooperation clause of his insurance contract.[1] Herron confessed judgment on April 2, 2004, to Kenick and Trailov in the amount of $1,937,500. Docket No. 19, Ex. 24 at 2. He subsequently assigned all claims he may have had against

1. Specifically, the contract states "[w]hen we ask, an insured person must cooperate with us in the investigation, settlement and defense of any claim or lawsuit. If we ask, that person must also help us obtain payment from anyone who may be jointly responsible. We can't be obligated if an insured person voluntarily takes any action or makes any payment except as specified in this policy." Docket No. 19, Ex. 1 at 25.

Allstate to Kenick and Trailov. *Id.*, Ex. 25. In exchange, it appears that Kenick and Trailov agreed not to execute the judgment against Herron.[2] Thus, the role of the Court in this case is limited to the issue of whether Herron's violation of the cooperation clause was justified by Allstate's alleged bad faith in handling the claims against him. Not surprisingly, the parties take differing views on which facts are relevant to this issue. However, an explanation of their respective views delineates the issue's contours for the Court.

Allstate focuses on a February 14, 2003, demand letter for policy limits from Kenick's and Trailov's attorneys. *See* Docket No. 2. In the February 14 letter Kenick's and Trailov's attorneys described the injuries Trailov sustained as a result of being a passenger in the car Herron was driving and the emotional toll seeing the effect of those injuries had on her mother, Kenick. At the end of the letter the attorneys made a demand for policy limits according to the terms of Allstate's contract with Herron. *Id.* at 3. Under the terms of that contract, the policy had a $100,000 bodily injury liability limit, a $25,000 medical payments limit, and a $100,000 uninsured/underinsured motorist ("UIM") limit. Docket No. 19, Ex. 1 at 5.[3] No deadline was set for the expiration of this offer. Allstate acknowledged receipt of the letter in a letter dated March 17, 2003, and requested additional documentation related to Kenick's and Trailov's claimed injuries. *Id.*, Ex. 3.

Allstate next points to a letter from Kenick's and Trailov's attorneys dated April 10, 2003. *Id.*, Ex. 4. The April 10 letter further explains the extent of Kenick's emotional distress and the effect of Trailov's brain trauma. However, it does not appear from the letter that any documentation was sent with the letter to Allstate substantiating Kenick's claim for emotional distress.[4] In closing the April 10 letter explained: "While the offer [for policy limits] dated February 14, 2002, remains open, it will be revoked on May 16, 2003, and a complaint will be filed, unless there is some discussion regarding pre-filing resolution."[5] *Id.*, Ex. 4 at 2.

---

**2.** Allstate points to the confessed judgment and the assignment of claims to show that Kenick and Trailov agreed to not execute the judgment. Docket No. 19 (Mem.) at 12. These documents do not mention any agreement to not execute against Herron. However, Herron does not dispute that he received such assurances.

**3.** The insurance contract actually covers four automobiles. Docket No. 19, Ex. 1 at 4—7. The parties do not state which automobile was involved in the single car accident. However, this omission is immaterial since each automobile has the same above listed policy limits.

**4.** The letter claims that Kenick had to change jobs because of the stress caused by the accident, resulting in a salary $13,000 lower than her prior job. The letter also states that Kenick was not currently undergoing psychiatric counseling. However, in contrast with the letter's indication that medical records related to Trailov's condition were enclosed, there is nothing in the letter to indicate that similar records related to Kenick were sent to Allstate. Indeed, Allstate's follow-up letter to the April 10 letter supports this inference because it asked for substantiating documentation supporting Kenick's claim that she had taken a lower-paying job. *See* Docket No. 19, Ex. 5.

**5.** The Court may refer to the May 16 revocation date as a "deadline" in this Order. This characterization is for convenience's sake only, and the parties should not take any such reference as a definitive ruling by the Court on the issue of whether the date was irrevocable or a true deadline in the legal sense of the term. Nor should the parties take the Court's statements as commenting on whether Allstate's efforts met the terms of the offer, effectively accepting the policy limits demand as to Trailov or satisfying the offer's requirements to prevent its lapse.

Allstate responded with a letter dated May 9, 2003. *Id.*, Ex. 5. The May 9 letter stated that Allstate was "in the process of completing" its evaluation of Trailov's claim. But the letter again requested documentation supporting Kenick's claim for negligent infliction of emotional distress, specifically asking for something to support her claim that she had taken a lower-paying job as a result of the accident. To support that claim, Kenick's attorneys sent a letter dated May 15, 2003, with pay stubs showing the difference in salaries. *Id.*, Ex. 6. According to the May 15 letter, the loss in wages amounted to $18,000 per year. *Id.*

Allstate responded in a letter dated the following day, May 16—the same day outlined as the revocation date in the April 10 letter—and asked for documentation that could substantiated Kenick's claim that her change of employment was related to Trailov's injuries. *Id.*, Ex. 7. With regard to Trailov's claim, the letter explained that her demand involved a substantial amount of money requiring "a thorough review" and that Allstate's evaluation would be completed by the end of the month, although the claims adjuster hoped to respond to the demand sooner.

Allstate next points to its letter dated May 30, 2003, which it faxed to Kenick's and Trailov's attorneys the same day. In the letter Allstate made an offer of $100,000 to settle Trailov's "bodily injury claim" and $12,500 for attorney fees. *Id.*, Ex. 8. With regard to Kenick's claim, Allstate explained that it had not received documents supporting her claim that her employment change was related to the accident and offered $10,000 to settle her claim of negligent infliction of emotional distress. The letter explained further that if Kenick did not accept this offer, Allstate would continue to require supporting documentation, presumably to justify any future award.

However, on May 30, 2003, Allstate received a letter dated May 29, 2003, from Douglas Johnson of the Law Offices of Dennis Mestas. *Id.*, Ex. 9. Johnson's May 29 letter explained that he had been retained to file suit against Allstate. The timing of Johnson's letter in relation to Allstate's May 30 letter is unclear. Allstate obliquely suggests that Johnson's May 29 letter was received after Allstate faxed its May 30 offer letter, stating that the May 29 letter was received "late" in the day of May 30. Docket No. 19 (Mem.) at 6. Herron, in turn, suggests the opposite, stating that it was Allstate's May 30 letter that was faxed in the afternoon of May 30. Docket No. 49 (Mem.) at 39. In any case, Johnson's letter claimed that the May 16 "deadline" had lapsed and that Allstate had failed to make an offer on behalf of Herron to either Kenick or Trailov. The letter went on to offer to negotiate with Allstate to settle all claims for an amount "far in excess of the policy limits" and set a deadline of twenty days after which Kenick and Trailov would file suit.

Allstate's view is that the above events and dates are essentially dispositive of the bad faith issue outlined by the Court. The Court is less sure. Allstate attempts to frame its actions as those of an insurer consistently engaged in good faith "negotiations" with Kenick and Trailov. Under this view, Allstate was in the process of collecting information related to their claims, cooperated with their attorneys and the "arbitrary" date they set for settlement, and made a "good faith" offer to settle the case.

■ Under Alaska law, determination is of whether an insurer is acting in good faith is normally a factual issue, making summary judgment improper. *See Jackson,* 90 P.3d at 141—44 (approving special verdict form submitting to a jury the issue of insurer's duty of good faith and fair

dealing to insured when insurer refused third-party victims' policy limits demand); *Grace*, 944 P.2d at 467—68 (holding that trial court erred in granting summary judgment and remanding for jury determination of whether insurer breached its obligation to provide excess coverage, and if so, whether settlement offer was reasonable and non-fraudulent); *State Farm Mut. Auto. Ins. Co. v. Weiford*, 831 P.2d 1264, 1267—69 (Alaska 1992) (summarizing evidence justifying submission of insurance bad faith claim to jury). Allstate attempts to get around this general rule by citing to various cases where courts have summarily ruled that a particular insurance company did not act in bad faith. Docket No. 69 at 13—14. But their contentions that the May 16 "deadline" was not a deadline in the legal sense of the term and that they made good faith efforts to meet the requirements of the April 10 letter from Kenick's and Trailov's attorneys ignore other relevant conduct—conduct that Herron points to as outlining issues of material fact.

For example, "[t]he covenant of good faith and fair dealing ... obligates an insurer to inform the insured of all settlement offers and to inform the insured of the possibility the injured claimant may recover a judgment in excess of the insured's policy limits." *Jackson*, 90 P.3d at 142. While Allstate notified Herron of the February 14 policy limits letter, Docket No. 49, Ex. 32, Herron claims that his attorney was left out of the settlement negotiation loop, *id.* at 34, 37. Notably, Herron claims that his attorney was not notified about the May 16 "deadline" set in the April 10 letter. *Id.* at 35. He further claims that his attorney was never notified

that Allstate was going to allow the May 16 "deadline" to lapse while they awaited further documentation. According to Herron's expert on insurance law and procedure, Robert Wainscott, such failures and omissions constitute "terribly negligent conduct," *id.*, Ex. 63 at 26, especially when Herron's attorney had already expressed concern over expeditiously settling the case within policy limits after Herron apparently informed him about the February 14 offer, *see id.*, Ex. 34.

In relation to the above principal from *Jackson*, Herron also claims that Allstate never sent him an "excess judgment" letter notifying him that he faced a judgment that could potentially exceed the limits of his insurance contract. Docket No. 49 (Mem.) at 5. While Allstate was under no obligation to assure Herron that it would pay any judgment that exceeded policy limits, it was under a duty to notify Herron that he faced such a judgment and negotiate in good faith with Kenick and Trailov to protect Herron's interests.[6] A factfinder could infer that by opening a UIM investigation with regard to Trailov, Allstate knew there was a substantial likelihood that Herron faced an excess judgment and that Allstate acted in bad faith in failing to notify Herron of that fact.

Further, "[w]hen a plaintiff makes a policy limits demand, the covenant of good faith and fair dealing places a duty on an insurer to tender maximum policy limits to settle a plaintiff's demand when there is a substantial likelihood of an excess verdict against the insured." *Jackson*, 90 P.3d at 142; *see also Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin*, 828 P.2d 745, 768 (Alaska 1992).

---

6. Allstate did notify Herron that it would not pay any punitive damages that might be awarded in the case. Docket No. 49, Ex. 32. However, the letter makes no mention of excess liability beyond any potential punitive damages award. Whether it is evidence of bad faith because it fails the excess judgment letter requirement under Alaska law is a factual issue to be resolved at trial.

Here again, there is a question of fact as to whether Allstate acted with good faith in making its settlement offer. Herron claims that Allstate's offer was not actually for policy limits. The offer clearly states that it is an offer to settle Trailov's "bodily injury claims." But what is less clear is whether the offer is meant to settle Trailov's bodily injury claims under the contract's liability policy limit for bodily injury of $100,000, the UIM policy limit for bodily injury of $100,000, or both. Herron suggests that the offer was not made in good faith because it is purposefully vague as to whether UIM insurance even exists that would cover the accident. He points to internal communications from Allstate adjusters that recommend opening a UIM file on Trailov because of the seriousness of her injuries to suggest that Allstate knew UIM would apply to at least Trailov's claims. Docket No. 49, Ex. 43; *see also id.*, Ex. 63 ¶ 39.

Opening such a file suggests that, in the very least, Allstate felt UIM coverage may apply to Trailov's claims. Nonetheless, Allstate appears to have never notified Herron or his attorney that UIM coverage may apply to at least Trailov's claims nor does it appear that Allstate ever notified Kenick or Trailov.[7] The fact that it took over eight months from the date of the accident, three months after the initial policy limits letter, and two weeks after the initial May 16 "deadline" to open a UIM investigation—even though Allstate looks to have had all the information on Trailov

that it had previously requested—presents a factual question as to whether such conduct constitutes bad faith.[8] Furthermore, the eventual factfinder could infer that Allstate's May 30 fax was not responsive to the April 10 deadline-setting letter but rather a reflexive response to Johnson's May 29 letter rescinding any previous offers to settle the case for policy limits. In the least this issue is one that should be explored through discovery, i.e., whether Johnson's May 29 letter was received prior to Allstate's May 30 fax, Allstate's immediate reaction to the letter, and whether the letter was meant to cover both liability and UIM claims, one or the other, or both.

Unfortunately, rather than addressing these allegations, Allstate chooses instead to essentially ignore them.[9] It categorizes the allegations as irrelevant, attempting to cast the issue as a good faith request for a two-week extension to respond to the May 16 deadline. Herron points to a number of other Alaska insurance code violations, in addition to a number of alleged violations of Allstate's own internal policies. Without commenting on these allegations, the Court is confident that enough issues of fact remain in this case, as outlined above, to make summary judgment for either side inappropriate at this time. Accordingly, Allstate's motion will be denied.

## II. Herron's motion to compel

 Herron moves to compel the production of a number of documents. Docket No. 70. He claims that they are all

---

7. While a duty to inform Kenick or Trailov of the existence of UIM coverage may be more attenuated than any duty of disclosure Allstate owed Herron, the factfinder could infer that by failing to disclose the existence of such coverage and by being opaque with regard to which claims its May 30 settlement offer related, Allstate was acting to benefit its own monetary interests rather than the potentially conflicting interests of Herron. Such a finding would substantiate Herron's claim that

Allstate violated its "legal duty to act in good faith to protect the interests of [its] insured." *Jackson*, 90 P.3d at 142.

8. Once again, Herron's expert affies that a failure to disclose the existence of UIM coverage constitutes bad faith. Docket No. 49, Ex. 63 at 32.

9. Allstate also leaves the claims of Herron's expert unaddressed.

related to the issues in this suit and that Allstate has unjustifiably withheld production on a number of faulty theories, namely attorney-client privilege, work product, privacy, and irrelevance. Before responding to Herron's more specific arguments, Allstate makes a more categorical objection. *See* Docket No. 71. Allstate contends that any evidence of bad faith, based on Herron's theories in this case, is necessarily limited to conduct prior to June 1, 2003, i.e., after Allstate received Johnson's May 29 letter explaining that his office had been retained to file suit against Allstate and that all prior settlement offers had expired and were no longer open. The Court agrees.

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party...." Fed.R.Civ.P. 26(b)(1). Relevant evidence is any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. As outlined in some detail above, the only issue in this particular case, as opposed to the state action pending in Bethel, is whether Herron's breach of the insurance contract was excused because Allstate breached the covenant of good faith and fair dealing. According to his own theory of the case, Herron confessed judgment because Allstate acted in bad faith in failing to settle Kenick's and Trailov's policy limits demand. But those demands were taken off the table by Johnson's May 29 letter.[10] While the May 29 letter offered to settle the case, the offer was only for an amount that exceeded the policy limits. Herron fails to show how any of the evidence he requests in his motion to compel is relevant beyond the

end of May. Indeed, it was Allstate's alleged conduct up to that point that led to Kenick's and Trailov's state suit and the confessed judgment. Accordingly, any evidence requested in the motion to compel will be limited to evidence before June 1, 2003.

 Herron's motion objects to Allstate having redacted several documents and Allstate issuing a privilege log related to others. Docket No. 70 at 9—10. He claims that (1) the documents are not protected by the attorney-client privilege because Allstate's current counsel, Wilkerson & Associates, did not begin representing Allstate until August 25, 2003; (2) Allstate waived its attorney-client privilege after August 25 until March 4 by "putting its own good faith in issue" by filing this suit; and (3) the work product doctrine does not apply. With regard to the first argument, Herron fails to distinguish between Allstate's internal attorney communications and its outside counsel, apparently assuming that the only attorneys that Allstate consulted were those at Wilkerson & Associates. It should come as no surprise that a large company would have internal corporate counsel and that the company would consult with those attorneys in a case involving significant amounts of money, especially when the victims retain counsel specifically to file suit. As Allstate points out, courts do not distinguish between inside and outside counsel in applying the attorney-client privilege—it applies with equal force to both. *See United States v. Rowe*, 96 F.3d 1294, 1296 (9th Cir.1996). Allstate identifies Mike Mulvihill as its home office attorney to whom the privilege assertions refer. Herron fails to show why communications with

---

**10.** In any case, Herron's motion to compel is overbroad. He requests all documents connected to this case up to the date that Allstate filed the declaratory action in federal court, March 2, 2004. Docket No. 70 (Mem.) at 3.

Mulvihill should not come under the privilege.

As to the second argument, the Court's finding that Herron has failed to establish the relevancy of post-June 1 conduct dispenses with any inquiry into whether Allstate's suit puts its good faith at issue sufficient to waive the attorney-client privilege. And finally, Herron's work product argument is moot in light of the Court's finding that the attorney-client privilege applies to communications with Allstate's corporate counsel. Therefore, any objections to the withholding of documents under the attorney-client privilege is rejected.

■ The next category of documents that Herron moves to compel relate to a fire in the Herron home for which Charles Herron's father made a prior claim to Allstate, who had issued the homeowner's policy. According to Herron, the file may be relevant because "[t]he adjustment went badly and the Herron family believes Allstate may have singled the Herron family out for special handling thereafter." Docket No. 70 (Mem.) at 11. Allstate objects on relevancy grounds and includes with its opposition an affidavit from all of the adjusters involved in the current case, each of whom affies that they were unaware of the prior claim. Docket No. 75 at 12 & Ex. 9. Herron's theory of relevance is attenuated at best. In light of the adjustors' affidavits and the total lack of evidentiary support, the theory is even more speculative. The request is denied.

■ Herron next moves to produce what it claims is the UIM file created by Allstate in relation to Kenick's and Trailov's claims. Docket No. 70 (Mem.) at 11—12. Allstate claims they have produced every document related to any UIM evaluations prior to June 1. Docket No. 75 at 13—15. The Court agrees that any UIM files prepared prior to June 1, 2003, might be relevant to Herron's claims, as

outlined above. To the extent that any files or documents remain that Allstate has not produced, the motion to compel is granted.

■ Next, Herron moves for certain policies and procedures Allstate uses to evaluate claims. The Court agrees that such policies may be relevant to the issues in this case and will grant the request. However, Allstate indicates in its opposition that the parties are close to agreement on a protective order that would protect information in the documents that Allstate deems sensitive. Rather than specifically address which documents Allstate should produce, the Court will grant the motion and leave the parties to agree to the contours of the document production and the protective order. Should either party later have any objections in relation to this specific issue or the apparent pending agreement relating to these documents, they may raise them with the Court.

■ Finally, Herron moves to compel the personnel files of certain adjustors—specifically files outlining the job responsibilities and authority of adjustors in the Alaska office to settle claims independent of home office approval—involved in handling Herron's claim. Docket No. 70 (Mem.) at 14—15. He claims the files are relevant because they will show that the adjustors failed to comply with internal Allstate procedures, which caused Allstate to miss any realistic opportunity it had to settle. In response to the requests for Allstate policy and procedure regarding settlement authority, Allstate again indicates that a protective order is pending and that the documents will be produced. Should Herron object once Allstate has produced these documents, he may file his objection with the Court. With respect to requests for personnel files, Herron's theory is murky. It is unclear to the Court

how the files of individual adjusters will be relevant to the issue in this case, i.e., the negligence of Allstate as a company. Clearly, the files would be relevant in the state trial since claims were filed against individual adjusters. However, such claims are not at issue in this case. The request is denied.

**IT IS THEREFORE ORDERED:**

Allstate's motion for summary judgment at **Docket No. 19** is **DENIED**. Herron's motion to compel at **Docket No. 70** is **GRANTED IN PART and DENIED IN PART**. The parties are directed to proceed as directed in this Order.