James M. GRACE and Kathleen Grace, individually and as assignees of Ocelot Engineering, Inc., d/b/a Chaparral Cycle Supply And Bell Helmets, Inc., Appellants and Cross-Appellees,

v.

INSURANCE COMPANY OF NORTH AMERICA, Appellee and Cross-Appellant.

Nos. S–7017, S–7037.

Supreme Court of Alaska.

Aug. 22, 1997.

Rehearing Denied Sept. 24, 1997.

Richard D. Pennington, Richard D. Pennington & Associates, P.C., and Laurel J. Peterson, Law Offices of Laurel Peterson, Anchorage, for Appellants/Cross–Appellees.

Sanford M. Gibbs and Richard L. Waller, Brown, Waller & Gibbs, Anchorage, for Appellee/Cross–Appellant.

Before COMPTON, C.J., and RABINOWITZ and MATTHEWS, JJ.

### OPINION

COMPTON, Chief Justice.

## I. INTRODUCTION

James Grace and Kathleen Grace appeal from a grant of summary judgment dismissing their suit against Insurance Company of North America (INA) for damages caused by an allegedly defective product produced by INA's insured, Bell Helmets. We reverse and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

In July 1984, James Grace was injured in a motorcycle accident. At the time of the accident, Grace was wearing a helmet manufactured by Bell Helmets (Bell). He had purchased it from Ocelot Engineering (Ocelot). The helmet cracked on impact, compounding Grace's injury. Following the accident, Grace brought a product liability suit against Ocelot and Bell.

At the time of the accident, Bell had several layers of liability insurance coverage. Bell had a $100,000 self-insured retention. Bell's primary insurer, Mission National Insurance Co. (Mission), and first layer excess insurer, Integrity Insurance Co. (Integrity), originally provided coverage for an additional $5,000,000 of liability. However, both Mission and Integrity became insolvent in 1987.[1] INA provided liability coverage in excess of the $5,100,000 ostensibly provided by Mission,

---

1. The California Insurance Guaranty Association (CIGA) assumed $500,000 of their combined coverage obligations.

Integrity, and Bell's self-retention, up to a maximum of $15,100,000. Liability coverage in excess of $15,100,000 was apportioned among several other carriers.

The Graces offered to settle their suit for $3,000,000. However, Bell refused to expend any of its assets in excess of $100,000, the amount of its self-insured retention, to cover claims falling in the gap in coverage left by the insolvencies of Mission and Integrity. Bell also tendered defense to INA, and demanded that INA "drop down" and cover the obligations of the defunct carriers. INA refused, claiming that its policy did not require it to "drop down." INA stated to Bell that its policy would "not respond until the underlying $5 million coverages are spent, whether they are spent via insurance carriers' assets or are spent directly from the assets of Bell Helmet themselves."[2] In addition, INA urged Bell to settle the case and dismissed Bell's $100,000 offer as unrealistic.

In July 1991, Ocelot settled with the Graces. Ocelot confessed judgment based on an anticipated verdict of $8,120,920. With interest and attorney's fees, the final judgment amount exceeded $15,000,000. Ocelot assigned any rights to indemnification from Bell or its insurers to the Graces. In exchange, the Graces agreed not to execute on the judgment against Ocelot for at least three years.

Bell did not join in the settlement between Ocelot and the Graces. Instead, Bell denounced the settlement as unreasonable, because the Graces were "unlikely to prevail at trial, and even if [they] did, the amount of any judgment would be substantially less than $15.6 million." However, Bell considered a settlement on similar terms after its defense to the Graces' action proved questionable.[3] The settlement appealed to Bell because "the covenant not to execute the judgment would effectively eliminate any risk

of execution against Bell's assets. In effect, the risk of being uninsured would be transferred to the plaintiffs, who would then litigate with [INA]." However, under the terms of the INA policy, Bell was forbidden to settle the claim without INA's consent.

In August 1991, INA sought a declaratory judgment absolving it of any obligation to provide coverage in the Grace litigation. The Graces counterclaimed, seeking a declaration that INA had an obligation to pay all liabilities in excess of $5,100,000, whether or not the underlying sums were actually paid. The Graces also claimed that INA had a duty to "drop down."

Following INA's suit, Bell settled the underlying case without INA's consent.[4] Bell confessed judgment based on an anticipated verdict of $8,120,920.[5] With interest and attorney's fees, the final judgment amount exceeded $17,000,000. In return, the Graces agreed not to execute the judgment against Bell. The superior court found the settlement to be reasonable and made in good faith. INA objected to the settlement, and amended its complaint to allege that the settlement was the product of collusion.

The superior court initially granted partial summary judgment for INA on the "drop down" issue. The court also held that a triable issue of fact remained whether the settlement was the product of fraud or collusion. Later, the court set aside Bell's attorney-client privilege to allow investigation of the fraud claim.

The court ultimately granted summary judgment for INA on the remainder of its claim. The superior court acknowledged that a question of fact remained whether INA had breached its contract by refusing to provide coverage until the underlying $5,100,000 was actually paid. However, the court held that Bell's breach of the coopera-

---

**2.** Bell's ability to pay or borrow $5,100,000 was problematic. A more complete account of INA's statements concerning its willingness to "respond" prior to actual payment of the underlying funds is contained in notes 15 and 16, *infra*.

**3.** Witnesses to the crash insisted that Grace had landed on dirt. Bell's expert stated that a landing on dirt could not crack the helmet absent a

defect. However, Bell continued to believe that it would prevail at trial.

**4.** The original judgment used an incorrect name for Bell. The court corrected that error in a later order.

**5.** The judgment which Ocelot confessed in favor of the Graces also was $8,120,920.

tion clause would have been excused only if INA's breach "occasioned" Bell's breach. The court found that Bell's breach was a response to INA's refusal to "drop down," rather than its denial of excess coverage. The court later clarified its ruling, stating that INA was prejudiced by the settlement as a matter of law, and that the settlement voided INA coverage.

The Graces appeal,[6] claiming that even though the settlement breached INA's "cooperation clause," that breach was excused by INA's improper acts. INA cross-appeals.

## III. DISCUSSION

### A. Standard of Review

As this is an appeal taken from a grant of summary judgment, we review the issues de novo. Beilgard v. State, 896 P.2d 230, 233 (Alaska 1995). Summary judgment may be granted only if there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law. Alaska R. Civ. P. 56(c); see also Estate of Arrowwood v. State, 894 P.2d 642, 644 n. 2 (Alaska 1995). All factual inferences are drawn in favor of the non-moving party. The existence of a genuine issue as to a material fact precludes summary judgment. Beilgard, 896 P.2d at 233.

### B. The Settlement between Bell and the Graces Was a Breach of Bell's Agreement with INA.

"Ordinarily, an insured's breach of [a] cooperation clause relieves a prejudiced insurer of liability under the policy." Arizona Property & Cas. Ins. Guar. Fund v. Helme, 153 Ariz. 129, 735 P.2d 451, 458–59 (1987). INA's policy contains a cooperation clause which states that "no obligation shall be incurred on behalf of INA without its consent being first obtained." Bell's settlement not only confessed liability on INA's behalf, but also resulted in the entry of a judgment which would require INA to pay the maximum amount possible under its policy. INA did not consent to this settlement. The settlement violated INA's cooperation clause. Moreover, that breach prejudiced INA by exposing it to a judgment in excess of $17,000,000.[7] As a result, Bell's breach voids INA's coverage, unless INA's misconduct justified Bell's breach.[8] Helme, 735 P.2d at 459.

### C. If INA Breached Its Obligations to Bell, Bell Was Entitled to Take Reasonable Steps to Protect Itself.

Under Alaska law, "if an insurer has wrongfully denied coverage, it has materially breached its contractual obligation to the insured ... and cannot escape liability on the ground that the insured failed to comply with other terms of the contract subsequent to its own breach." Davis v. Criterion, 754 P.2d 1331, 1332 (Alaska 1988) (holding that if insurer wrongfully denied coverage, insurer could not raise insured's failure to provide notice of a suit under a cooperation clause as a defense to liability); see also Theodore v. Zurich Gen. Accident & Liab. Ins. Co., 364

---

6. While Bell initially appeared through counsel, it since has withdrawn from this case.

7. We have held that where an insurer breaches its contract, it is liable for that amount of a reasonable settlement reached by the insured which falls within the coverage provided by the policy. Afcan v. Mutual Fire, Marine, and Inland Ins. Co., 595 P.2d 638, 646–47 (Alaska 1979). Therefore, if the Graces' claims that INA breached its contract and that the settlement was reasonable are correct, the settlement would be binding on INA. The Graces' claim that the potential exposure to a $17,000,000 settlement did not prejudice INA is disingenuous, and lacks merit.

8. The Graces contend that even if the settlement is unenforceable against INA, they are still entitled to litigate the merits of their product liability claim against INA. This claim lacks merit. If a party fails to perform its own obligations under a contract, and no valid excuse for non-performance exists, the performance obligations of the other party are discharged. See Restatement (Second) of Contracts § 237 cmt. a (stating that material failure of performance operates as non-occurrence of condition on other party's duty to perform, and discharges duty if condition can no longer occur); see also Helme, 735 P.2d at 458–59 (holding that insurer's failure to cooperate relieves insurer of liability under the contract). If Bell's breach was not excused by INA's conduct, INA's coverage obligations would be discharged by that breach, and the Graces would have no basis for recovery.

P.2d 51, 55 (Alaska 1961) (holding that when insurer unjustifiably refused to defend insured, insurer "put to an end its right to demand compliance by the insured with other terms of the agreement"). Other jurisdictions follow the same rule. *Isaacson v. California Ins. Guar. Ass'n*, 44 Cal.3d 775, 244 Cal.Rptr. 655, 666–67, 750 P.2d 297, 308 (Cal. 1988) (holding that if insurer violates its contractual duties by refusing to indemnify or defend insured, insured is "entitled to make a reasonable settlement of the claim in good faith"); *see also Helme*, 735 P.2d at 459 (holding that insurance policies "are governed by the basic contract law principle that if one party to a contract breaches the agreement, the other party is no longer obligated to perform his or her contractual obligations" including "obligations under [a] cooperation clause."). If INA wrongfully refused to indemnify Bell, Bell would be absolved from full compliance with the cooperation clause.[9]

### D. *INA Had No Duty to "Drop Down," Provide a Defense of Bell, or Tender Its Policy Limits in Settlement.*

#### 1. *INA's refusal to "drop down" did not constitute a breach of the insurance agreement.*

Under Alaska law, "an excess insurer is not required to drop down upon insolvency of the primary carrier absent policy language to the contrary." *Alaska Rural Elec. Cooperative Ass'n v. INSCO*, 785 P.2d 1193, 1194 (Alaska 1990) (holding that excess policy did not drop down); *see also Safety Nat'l Cas. Corp. v. Pacific Employers Ins.*, 927 P.2d 748 (Alaska 1996) (holding that excess insurers do not insure against underlying carriers' insolvency absent contrary terms). The policy at issue[10] renders INA liable "only for the ultimate net loss ... [in] excess of ... the Insured's underlying limit," which is defined as "an amount equal to the limits of liability indicated beside the underlying insurance listed in the schedule of underlying insurance, plus the applicable limits of any other underlying insurance collectible by the Insured." INA's list of underlying insurance includes both the Mission and Integrity policies.[11] Thus, INA is liable only for amounts in excess of the liability limits of the Integrity and Mission policies, not for amounts in excess of the sums actually paid by those policies. Indeed, a California court which considered identical policy language concluded that the excess carrier had no duty to "drop down" upon the insolvency of the underlying insurer. *Span, Inc. v. Associated Int'l Ins. Co.*, 227 Cal.App.3d 463, 277 Cal. Rptr. 828, 836 (1991) (holding that policies listed in Schedule of Underlying Insurance did not have to be "collectible" to set the lower limit of excess insurer's liability, since "collectible" referred only to insurance not listed).[12] The reasoning of *Span* is persuasive.

---

**9.** INA argues that Bell's breach would only be excused if that breach was "occasioned by" INA's wrongful conduct. *See Xebec Dev. v. National Union Fire Ins.*, 12 Cal.App.4th 501, 15 Cal.Rptr.2d 726, 749–50 (6th Dis.1993) (holding that insured's failure to cooperate must be "occasioned" by the insurer's breach in order for the insured's conduct to be excused); *see also State Farm v. Peaton*, 168 Ariz. 184, 812 P.2d 1002, 1010 (Ariz.App.1990) ("[F]or an insured to be free to [breach the cooperation clause] without simultaneously voiding coverage, the insurer must have done something in violation of its contract which placed the insured in jeopardy."). Under *Davis*, once an insurer has materially breached its obligations, it "cannot escape liability on the ground that the insured failed to comply with other terms of the contract subsequent to its own breach." *Davis*, 754 P.2d at 1332. Under that view, the cause of the insured's later breach is irrelevant. *See also* Restatement (Second) of Contracts § 237 cmt. c (stating that party's duty to perform is discharged by other party's breach whether or not non-breaching party

is aware of the breach). Since *Davis* controls, INA's contention fails.

**10.** INA adopted all of Integrity's policy terms which were not expressly contradicted by INA's certificate. The quoted passage is contained in the Integrity policy.

**11.** The Graces contend that INA's policy adopted Integrity's lower liability limit. This contention fails. Integrity's lower limit is calculated with reference to Integrity's schedule of underlying insurance. The terms used to calculate the lower limit are adopted by the INA policy, as the Graces claim. However, INA has a different list of underlying insurers than does Integrity. INA's lower limit is calculated with reference to a different list of underlying insurance, which produces a different limit level.

**12.** The Supreme Court of Alabama reached the opposite conclusion when interpreting this language. *Alabama Ins. Guar. v. Magic City Trucking Serv.*, 547 So.2d 849, 854 (Ala.1989).

Moreover, the Integrity policy, like the policy at issue in *Span*, expressly limits INA's role as an underlying insurer to circumstances in which the underlying limits are exhausted by payment of losses.[13] *See id.*, 277 Cal.Rptr. at 834 (holding that excess policy was triggered when underlying limits were exhausted "by reason of losses paid thereunder"). The policy provides no basis for requiring INA to "drop down" if underlying limits are exhausted by other events, such as the insolvency of the underlying carriers. INA had no duty to provide "drop-down" coverage.

2. *INA did not have a duty to defend Bell.*

INA's policy provides in part that "INA shall not be obligated to assume charge of the settlement or defense of any claim or suit brought or proceeding instituted against the insured," although it retains the right to do so. This unambiguous language defeats any claim that INA had a duty to defend Bell. *See INSCO*, 785 P.2d at 1195 (holding that it is not unfair to leave risks of primary carrier's insolvency with Insured). Indeed, a California court held that this policy language does not require an insurer to defend the insured. *Chubb/Pacific Indem. Group v. Insurance Co. of North America*, 188 Cal. App.3d 691, 233 Cal.Rptr. 539, 541 (1987) (holding that excess insurer contracted against a duty to defend the insured). INA's refusal to defend Bell did not constitute a breach.

3. *INA had no duty to evaluate the Graces' claim and tender its policy limits in settlement.*

The Graces contend that INA breached a duty to evaluate independently claims which potentially might invade its coverage, and to offer its full policy limit for settlement. They base this claim on *Bohna v. Hughes, Thorsness, Gantz, et al.*, 828 P.2d

745 (Alaska 1992). Under *Bohna*, "where an adverse verdict in excess of policy limits is likely, an insurance company has the duty to determine 'the amount of a money judgment which might be rendered against its insured,' and 'to tender in settlement that portion of the projected money judgment which [it] contractually agreed to pay.' " *Id.* at 768 (quoting *Schultz v. Travelers Indem. Co.*, 754 P.2d 265 (Alaska 1988)) (holding that insurer breached obligation of good faith by failing to tender required amount). This argument fails.

Under *Bohna*, insurers must tender their policy limits for settlement in order to prevent their insureds from becoming exposed to adverse verdicts in excess of policy limits. *Id.* This rule permits an insured to accept a settlement within its policy limits, which it presumably could not do if the insurer refused to release the needed funds. By facilitating settlements within policy limits, this rule eliminates the risk that an insurer's refusal to settle could expose an insured to uncovered liability following trial.

Unlike the circumstance in *Bohna*, INA's failure to tender its policy limits did not present an obstacle to the settlement of the case within Bell's policy limits. Prior to the settlement, the Graces' highest demand was $3,000,000. This amount fell short of INA's lower limit. Nevertheless, Bell refused that demand. Any risk that Bell would become subject to a verdict that invaded INA's coverage was due to Bell's refusal to settle for $3,000,000, rather than INA's failure to make it possible for Bell to settle for an amount in excess of $5,100,000. To require INA to tender funds to Bell, so that Bell could settle the claim for the $3,000,000 the Graces demanded, would effectively require INA to provide "drop down" coverage. As noted, INA was not required to do so.[14] INA had no duty to evaluate the Graces' claim or to

---

13. The Integrity policy provides that "In the event that the aggregate limits of liability of the underlying policies . . . are exhausted or reduced, *solely as the result of occurrences* taking place after the inception date of this policy, this policy shall . . . continue in force as underlying insurance." (Emphasis added.) "Occurrence" is defined as "an accident . . . which results in personal injury."

14. An attempt by Bell to settle the case for $8,000,000, thus invading INA's coverage by the $3,000,000 of the Graces' demand, and then failing to pay the underlying $5,100,000, also would be nothing more than an attempt to force INA to "drop down."

make its policy limits available for use in a settlement.

### E. The Superior Court Erred in Granting Summary Judgment on the Graces' Claim that INA Breached Its Obligations by Refusing to "Respond" until $5,100,000 Was Actually Paid.

 INA's policy required it to pay "all sums ... for which the Insured shall become obligated to pay by reason of liability," as provided in the Integrity policy. These terms do not require that such funds actually be paid before coverage is triggered. Moreover, several cases have held that the payment or non-payment of funds owed by a primary insurer is irrelevant to an excess carrier's duty. *Federal Ins. Co. v. Srivastava,* 2 F.3d 98, 102 (5th Cir.1993) (holding that under Texas law, excess carrier's coverage layer begins at the limits of the underlying policies "regardless of whether the underlying insurers actually pay those policy limits."); *see also Weaver v. Kitchens,* 570 So.2d 508, 510 (La.App.5th Cir.1990) ("Excess coverage is not dependent on the recoverability or collectibility of the primary limits" of underlying insurance). INA has cited no authority to the contrary, nor do its policy terms unambiguously indicate that its duty to pay was contingent on actual payment of the underlying limits.[15] Hence, if INA refused to honor its commitments until the underlying $5,100,000 was actually paid, it breached its contract.

 It is not clear whether INA did refuse to indemnify Bell until the underlying $5,100,000 was actually paid.[16] However, the evidence is sufficient to support a finding that it did so, and that its position was clear enough to constitute an anticipatory repudiation of the contract.[17] Since the facts could support a finding that INA did breach its contract, summary judgment on this issue was improper. Accordingly, we remand this case for a factual determination whether INA in fact anticipatorily repudiated its contractual obligations. If, on remand, the jury determines that INA did breach its obligation to provide excess coverage, the jury must consider the additional factual issues whether the settlement was reasonable and non-fraudulent.[18] Only if the jury resolves

15. One portion of the Integrity policy declares that the excess insurer would operate as "underlying insurance" if the underlying insurance were exhausted "solely as the result of occurrences," with "occurrences" defined as "accident[s] ... which results in personal injury." This language could be read to mean that INA only had a duty to provide "underlying coverage" in the event that the limits of the Mission and Integrity policies were exhausted by reason of "occurrences," and that INA had no duty to act if the underlying limits were discharged in bankruptcy. However, the Integrity policy also provides coverage for losses "which the insured shall become obligated to pay" through judgment or agreement. This language indicates that INA became obligated to pay whenever its insured became liable for amounts invading INA's coverage, regardless of whether or not its insured or one acting on its behalf actually paid the underlying limits. It is well settled that ambiguities in insurance contracts are to be resolved in favor of the insured. *U.S. Fire Ins. Co. v. Colver,* 600 P.2d 1, 3 (Alaska 1979). INA's duty was triggered when Bell became liable for sums in excess of INA's lower coverage limit, rather than when the underlying limits were actually paid.

16. INA repeatedly claimed that its policy would "not respond until the underlying $5 million coverages are spent, whether they are spent via insurance carriers' assets or are spent directly from the assets of Bell Helmet themselves." INA also argued this position in court, in opposition to the Graces' motion for summary judgment. However, on other occasions, INA stated that its own liability was triggered when the amount of liability was "adjudged," rather than when the underlying amount was paid.

17. Under *Drake v. Wickwire,* 795 P.2d 195 (Alaska 1990), "language that under a fair reading 'amounts to a statement of intention not to perform except on conditions which go beyond the contract' constitutes a repudiation." *Id.* at 198 (adopting Sections 250, 251, and 253 of the Restatement (Second) of Contracts). INA's statements indicated that INA would not indemnify Bell except on extra-contractual conditions (actual payment of the underlying amount). This conduct could constitute anticipatory repudiation, although INA's statements that it would pay upon "adjudication" of liability indicate otherwise.

18. INA also has alleged that the settlement was the product of collusion and a breach of good faith. If INA did breach its obligations, the Graces had no duty to act out of solicitude for the interests of INA, and were not forbidden from reaching an agreement with Bell which ran counter to the interests of INA. These claims therefore fail. However, in so doing, the Graces remained obligated to act with honesty, and to

these issues favorably to the Graces [19] can the settlement be enforced against INA.[20]

## IV. CONCLUSION

Bell breached its contract with INA by settling with the Graces without INA's consent. However, a genuine issue of material fact remains whether INA first repudiated its own obligations by refusing to "respond" until $5,100,000 was actually paid on the Graces' claim. If INA did commit such a breach, issues of fact remain as to the reasonable, non-fraudulent nature of the settlement itself. Accordingly, the decision below is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

EASTAUGH and FABE, JJ., not participating.

reach a reasonable settlement. As a result, the settlement cannot be enforced if the jury concludes that settlement was the product of fraud, or was otherwise unreasonable.

In addition, we note that Bell's attorney-client privilege was properly set aside by the superior court. "The general rule is that there must be a *prima facie* showing of fraud before the attorney-client privilege is deemed defeated." *United Services Auto Ass'n v. Werley*, 526 P.2d 28, 32 (Alaska 1974) (holding that evidence must support a finding of fraud before attorney-client privilege ceases to apply). While an issue of fact remains as to whether this settlement actually was the product of fraud, the evidence is sufficient to present a *prima facie* case of fraud.

19. In *Washington Insurance Guaranty Ass'n v. Ramsey*, 922 P.2d 237 (Alaska 1996), this court cited a test adopted in Washington for determination of the reasonableness of a settlement combined with a covenant not to execute against the insured. That test considered the following fac-

tors: "[t]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released." *Id.* at 247–48 (citing *Glover v. Tacoma Gen. Hosp.*, 98 Wash.2d 708, 658 P.2d 1230, 1236 (1983)).

20. INA's contention that the settlement could not be enforced against it in any event, since there has been no "adjudication of the merits of the claims against the insured," fails. As noted, an insurer that breaches its contract is liable for that amount of a reasonable settlement reached by the insured which falls within the coverage provided by the policy. *Afcan*, 595 P.2d at 646–47. If the settlement was reasonable and non-fraudulent, it would be enforceable against INA.