James M. GRACE, Appellant

v.

Laurel J. PETERSON, P.C. and Kathleen Grace, Appellees.

No. S–13768.

Supreme Court of Alaska.

Jan. 13, 2012.

---

45. *Lawrence,* 26 P.3d at 1079.

Kenneth P. Jacobus, Kenneth P. Jacobus, P.C., Anchorage, for appellant.

Herbert M. Pearce, Law Office of Herbert M. Pearce, Anchorage, for appellee Grace.

Notice of non-participation filed by appellee Laurel J. Peterson, P.C.

Before: CARPENETI, Chief Justice, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

James Grace suffered permanent brain injuries when his helmet failed after he braked to avoid hitting a dog and was thrown over the handlebars of his motorcycle. Grace and his wife, Kathleen, filed personal injury and loss of consortium claims against the helmet retailer and manufacturer. After receiving confessions of judgment and assignments of rights from the retailer and manufacturer of

1. 794 P.2d 1346, 1348 (Alaska 1990).

the helmet, the Graces received disbursements from the receiver of one of the manufacturer's second-tier insurance providers that had filed for bankruptcy and gone into liquidation. The Graces also filed a bad faith insurance claim against the manufacturer's third-tier insurance carrier, and ultimately entered into a settlement agreement with the carrier.

James and Kathleen separated at some point after the accident, divorced for one month in 2000, but then remarried. They have continued to live separately since their remarriage. Except for a partial disbursement of funds that occurred while their final divorce hearing was pending, the Graces have been unable to agree upon how the remaining settlement and insurance proceeds should be divided. The Graces' lawyer, Laurel Peterson, filed an action for interpleader asking the superior court to determine how to divide the remaining funds. After a one-day trial, the superior court concluded that: (1) based on the "analytic" approach articulated in *Bandow v. Bandow*,[1] the portion of the recovery from the receiver for the manufacturer's second-tier insurance carrier that was allocated for "past economic loss," "past medical loss," and "rehabilitation services" was marital property and should be divided equally; and (2) the recovery from the third-tier insurance carrier was the result of a jointly-assigned bad faith insurance claim and belonged to both parties.

James appeals. We affirm the superior court's division of the proceeds from the second-tier insurance carrier, but reverse its division of the proceeds from the third-tier insurance carrier.

## II. FACTS AND PROCEEDINGS

### A. Facts
#### 1. Accident and resulting litigation

In July 1984, James Grace was thrown over the handle bars of his motorcycle after he braked to avoid hitting a dog. James was wearing a helmet that "failed and fractured" upon impact. It had been purchased from Ocelot Engineering, Inc. (Ocelot) and manufactured by Bell Helmets (Bell). James suf-

fered head injuries that resulted in permanent impairment.

At the time of the accident, Bell had multiple layers of insurance: the first layer was a $100,000 self-insured retention; Bell also had primary insurance from Mission National Insurance Co. (Mission); Bell's excess coverage was by Integrity Insurance Co. (Integrity) for the first $5.1 million in liability exposure for manufacturing defects; Bell had an additional $10 million in excess coverage by Insurance Company of North America (INA). Both Mission and Integrity became insolvent in 1987.

The accident resulted in three separate claims: (1) a claim by James against the dog's owner that settled for $310,000; (2) a claim by James and his wife, Kathleen, against Ocelot, Bell, and James's doctor[2]; and (3) a claim by INA naming the Graces as defendants individually and as assignees of Ocelot and Bell and seeking a declaratory ruling that INA had no obligation to provide any coverage until Bell first paid $5.1 million from its own assets.

### 2. Confessions of judgment and assignments of rights

In July 1991, Ocelot settled with the Graces, entering into a confession of judgment based on an anticipated verdict of $8,120,920.[3] Including interest and attorney's fees, the judgment exceeded $15,000,000.[4] As the manufacturer, Bell was required to completely indemnify Ocelot for any liability. Ocelot assigned to the Graces all rights to indemnification from Bell or its insurers. In exchange, the Graces agreed not to execute

on the judgment against Ocelot for a set period of time.[5]

Two years later, Bell agreed to enter into a confession of judgment in the same amount as Ocelot, with then-accrued interest and attorney's fees. This resulted in a final judgment in excess of $17,000,000.[6] The Graces accepted an assignment of all rights against Bell's insurance carriers and agreed not to execute on the judgment against Bell. The superior court ruled the settlement was reasonable and made in good faith.[7]

### 3. INA litigation

In 1991, INA filed a lawsuit against the Graces individually and as assignees of Ocelot and Bell seeking a declaration that INA had no obligation to provide any coverage until Bell paid $5.1 million from its own assets. The Graces counterclaimed seeking a declaration that INA was obligated to pay all of Bell's liabilities in excess of $5.1 million, even if the $5.1 million was never paid, and claiming that Bell's failure to seek INA's approval of its settlement with the Graces was excused because INA had a duty to provide additional coverage due to the insolvency of the other carriers; i.e. a duty to "drop down."[8] INA objected to the settlement and amended its complaint to allege that the settlement was the product of collusion.[9]

After the superior court concluded that Bell's settlement with the Graces voided INA coverage, the Graces appealed. They claimed that even though the settlement breached a cooperation clause in the INA policy, the breach was excused by INA's

---

**2.** The claim against James's doctor was for medical malpractice. It was later dismissed.

**3.** This figure was based upon expert analysis of expected damages in the underlying case. It included:

| | |
|---|---|
| $2,890,843 | Past Economic Loss |
| $ 60,697 | Past Medical Loss |
| $1,644,380 | Rehabilitation Services |
| $ 475,000 | Past Pain & Suffering |
| $1,200,000 | Future Pain & Suffering |
| $ 850,000 | Loss of Enjoyment of Life |
| $1,000,000 | Loss of Consortium |

**4.** *Grace v. Ins. Co. of N. Am.*, 944 P.2d 460, 463 (Alaska 1997).

**5.** The assignment agreement stated that Ocelot would pay the Graces $500,000 per year for ten years "beginning the [f]ifth annual anniversary of the execution of this document," but that "all sums received from any source, pursuant to the assignments stated herein" would be credited to Ocelot's annual obligation.

**6.** *Grace,* 944 P.2d at 463.

**7.** *Id.*

**8.** *Id.*

**9.** *Id.*

improper acts.[10] Our court reversed the superior court's ruling. We held that INA had no duty to "drop down" to defend Bell or to tender its policy limits in settlement, and the settlement between Bell and the Graces breached Bell's agreement with INA. But we also decided there was a genuine issue of material fact that prevented us from ruling on whether INA first repudiated its obligations by refusing to respond until $5.1 million was actually paid on the Graces' claim.[11]

On January 29, 1999, INA settled with the Graces.[12] The Graces paid litigation costs and attorney's fees out of the proceeds from the settlement of the bad faith claim against INA and purchased an annuity for James using some of the remaining funds. On March 30, 1999, the remaining proceeds were placed in an account at First National Bank of Alaska.

#### 4. Interim payments from Integrity's receiver

Both Mission and Integrity went into receivership and, ultimately, liquidation. Mission's receiver exhausted Mission's $500,000 limit defending against the Graces' litigation. Integrity's receiver recognized the claims made against Integrity and a damages amount for the Graces' claim was agreed upon.[13] Integrity's receiver made six payments to the Graces beginning in April 1999. These funds, less one-third attorney's fees, were deposited in the Graces' First National Bank account.

#### 5. Divorce, partial disbursement, and remarriage

On October 19, 1999, Kathleen filed for divorce. Judge Eric Sanders granted a bifurcated divorce and reserved property is-

sues for trial. The Graces then agreed to a partial disbursement of the funds in the First National Bank account, leaving the remaining balance in the account pending the court's final property division.[14] But the Graces decided to remarry before the hearing on property division, and on September 25, 2000, Judge Sanders dismissed the divorce/property division case for lack of jurisdiction. It appears from the record available to our court on appeal that the Graces have remained married, but have continued to live separately, since late 2000.[15] The record is void of evidence indicating whether they have operated as a joint economic unit since their remarriage.

#### B. Proceedings

On February 24, 2006, Laurel Peterson filed a complaint for interpleader of funds, requesting that the balance remaining in the First National Bank account be deposited with the clerk of the court and that the court determine how the proceeds should be disbursed to the Graces.

On May 9, 2007, Kathleen filed a motion to divide and disburse the remaining funds, claiming that she was entitled to one-half of the funds because she and James were "equal holders of the assignments." James filed an opposition to Kathleen's motion, claiming that the assignments from Ocelot and Bell were made "without any allocation of individual right or individual shares," that the settlement funds from INA were intended to compensate James for his personal injuries, that Kathleen's only claim was for loss of consortium, and that the funds should therefore not be disbursed equally.

The superior court held a non-jury trial on August 17, 2009, and issued its decision on September 15, 2009. After finding that the

---

**10.** *Id.*

**11.** *Id.* at 468.

**12.** All prior claims made against Mission and Integrity were reserved.

**13.** One of the lawyers who represented the Graces in the underlying case, Laurel Peterson, stated during trial in the interpleader action that the money from Integrity was the "result of a

claim being filed that alleged the injuries sustained and the liability of their insured, pre-liquidation, pre-receivership."

**14.** These disbursements are not at issue in this case.

**15.** The date when the Graces began to live separately and the details of the separation are unclear from the record before us. *See infra* Part IV.A.

bank account contained funds from two distinct sources (INA and Integrity), the court applied the "analytic" approach articulated by our court in *Bandow v. Bandow*[16] to classify the portions of the Integrity recovery allocated for "past pain and suffering," "future pain and suffering," and "loss of enjoyment in life" as James's separate property. The portion allocated for "loss of consortium" was classified as Kathleen's separate property, and the portions allocated for "past economic loss," [17] "past medical loss," and "rehabilitation services" were classified as marital property to be divided equally. The court concluded that the INA recovery was for "the insurance bad faith claim, and not for the underlying personal injury claim." The superior court divided the remaining INA recovery equally.

James appeals.

## III. STANDARD OF REVIEW

The parties agreed that principles applicable to division of marital property should control the allocation of the proceeds from the underlying accident. Therefore, we look to standards of review applicable to cases involving the division of marital property.

 The trial court's characterization of property as separate or marital in a divorce proceeding is reviewed for abuse of discretion.[18] "However, when the trial court makes a legal determination in the course of carrying out this step, that determination is reviewed *de novo*." [19] Under this standard, it is this court's duty to "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." [20] Any factual findings the superior court made in determining

whether to classify settlement proceeds as marital property "will not be disturbed unless clearly erroneous." [21]

 The superior court's ultimate distribution of assets in a divorce proceeding is likewise reviewed for abuse of discretion and will be reversed only if the distribution is clearly unjust.[22]

## IV. DISCUSSION

On appeal, James raises two arguments: (1) under *Bandow*, it was error to classify the portion of the Integrity recovery allocated for "past economic loss," "past medical losses," and "rehabilitation services" as marital property without taking into account the fact that the Graces have lived separately since 1991; and (2) it was error to conclude that the INA settlement proceeds were paid to resolve an insurance bad faith claim that was a "separate and distinct cause of action" from James's original personal injury claim.

### A. The Superior Court Did Not Err By Failing To Consider The Parties' Physical Separation When Dividing The Integrity Proceeds.

#### 1. The superior court did not err by declining to use the Graces' date of physical separation to differentiate assets.

 The superior court divided the proceeds received from Integrity's receiver by classifying each category of damages upon which the confessions of judgment were based as "separate" or "marital" property using the "analytic" approach we adopted in *Bandow v. Bandow*.[23] The superior court recognized that, under *Bandow*, tort recovery compensating for "losses to the marital

---

16. 794 P.2d 1346, 1348 (Alaska 1990).

17. The superior court's decision uses the term "past economic loss," but the exhibit upon which this figure is based states that this figure was actually an estimate of "Net Past *and Future* Period Economic Loss." (Emphasis added.)

18. *Fortson v. Fortson*, 131 P.3d 451, 456 (Alaska 2006) (citing *Martin v. Martin*, 52 P.3d 724, 726 (Alaska 2002)).

19. *Lundquist v. Lundquist*, 923 P.2d 42, 47 (Alaska 1996); *see also Fortson*, 131 P.3d at 456.

20. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

21. *Hatten v. Hatten*, 917 P.2d 667, 672 n. 11 (Alaska 1996) (quoting *Bays v. Bays*, 807 P.2d 482, 485 n. 4 (Alaska 1991)).

22. *Martin*, 52 P.3d at 726; *see also Harrelson v. Harrelson*, 932 P.2d 247, 253 (Alaska 1997) ("We have held that trial courts have broad discretion in dividing property and that such decisions will not be disturbed unless clearly unjust.").

23. 794 P.2d 1346, 1348 (Alaska 1990).

estate, such as pre-divorce earnings," is marital property. The court also recognized that tort recovery compensating for "post-divorce earnings" and for "non-economic damages such as pain and suffering" is separate property.[24] The Graces were legally married at the time of the interpleader action and the superior court did not establish a date of separation to distinguish between recovery intended to compensate for marital expenses and losses, and recovery intended to compensate for "post-marital" expenses and losses.

Both parties agree that the "analytic" approach articulated in *Bandow* controls the classification of the recovery received from Integrity, even though the Graces are married.[25] But James argues that the court should have taken the Graces' "permanent separation" in 1991 into account when dividing the funds remaining in the First National Bank account because "the [proper] date for determining whether property is marital or non-marital is the date that the marriage has terminated as a joint enterprise, that is, the date of separation." Kathleen counters that James waived this argument because he did not raise the Graces' separation as an issue to be considered at trial or "present any evidence as to the duration of the parties' separation, or to the reasons behind why the parties had decided to live in separate residences" in his pleadings or at trial. Kathleen argues in the alternative that "the fact that [the Graces] have lived separately has no merit or bearing on the issues before this Court" because the Graces were married

when the injury occurred, when the original lawsuit was filed, when they signed the assignments of rights with Ocelot and Bell, and when INA filed the lawsuit against them, and they remain married today, with divorce neither pending nor likely.

■ Under some circumstances, a long-term separation—even in the absence of divorce—might influence the characterization of an asset as either separate or marital property. But as we stated in *Bandow*, "to the extent that the parties do not provide sufficient evidence to make a reasonable allocation to a separate estate, the award should be classified as marital property."[26] James argued at trial that the Graces' permanent separation should be considered when dividing the Integrity proceeds,[27] but the record does not include any evidence supporting his assertion on appeal that the parties stopped operating as a joint economic unit.[28] The absence of evidence regarding how the parties have configured their finances since they began living apart is significant: James's counsel asserts that James has borne his own living expenses and the Integrity settlement should therefore be allocated to him; Kathleen contends that the expenses associated with James's injury "depleted the marital estate"—in other words, she maintains that the expenses have been borne jointly, and that the Integrity recovery should be treated as marital property. The record does not allow us to determine whether the parties

24. *Id.* at 1348–50.

25. James argues on appeal, "Logically, this is an accounting case and not a divorce case. However, since the parties have been separated for many years without formally divorcing, the principles of property division in a divorce make sense and should be applied."

26. 794 P.2d at 1350 (citing *Landwehr v. Landwehr*, 111 N.J. 491, 545 A.2d 738, 744 (1988)).

27. Counsel for James stated: "Even though they're married you can't treat this as a marital unit because they separated years ago," and "regardless of what Mr. Grace believes, I believe that the only reason they're legally married is that Ms. Grace is hanging [o]nto this to make the claim...." About the category of recovery allocated to "economic loss," he argued: "It's marital but it should not be divided equally, it should

be divided based upon life expectancy and the date of separation."

28. James asserts in his appellate brief that the trial testimony established that Kathleen and James separated in 1991 and Kathleen "supported herself for the last eighteen years and continues to do so without James's financial involvement." He also argues the parties have "had no economic interaction since the date of separation" and neither party "has contributed to the other's financial needs since the 1991 separation." But Kathleen's brief counters that the trial record does not include any evidence to support these assertions, and, in his reply brief, James concedes that he did not raise the issue of "when the parties separated" in the superior court because "the issue was not relevant until the trial court assigned items to Kathleen ... which should not have been assigned to her."

paid their living expenses separately or as a joint economic unit. James argued—incorrectly—that Kathleen bears the burden of proof on this issue.[29] It was James's burden to prove that the Integrity recovery should be treated as his separate property.[30]

Because the Graces remain married, because they did not divide their property at the time they briefly divorced, and because James failed to offer any evidence at trial regarding the date or financial circumstances of the Graces' separation, the superior court did not err by declining to use the Graces' 1991 physical separation to differentiate "marital and post-marital" property.

**2. It was not an abuse of discretion to classify "past economic loss," "past medical loss," and "rehabilitation services" as marital property under *Bandow*.**

■ James also argues that the superior court's classification of the Integrity proceeds for "past economic loss," "past medical losses," and "rehabilitation services" as marital property was incorrect because these categories of recovery were meant to compensate for losses to James's separate estate. Kathleen responds that the superior court correctly classified these proceeds as marital property under *Bandow* because "[a]ll medical expenses occurred during the marriage" and "Mr. Grace's rehabilitation expenses are expenses of the marital estate that decrease the net worth of the marital estate."

■ In *Bandow*, we held that a tort recovery for "medical expenses" could be "a combination of marital and separate property: marital property to the extent it compensates

for pre-divorce expenses [and] separate property to the extent it compensates for post-divorce expenses."[31] Here, the category of damages allocated to "past medical loss" was based on the actual expenses the Graces had incurred for medical services as of the time the first offer of judgment was made in 1991.[32] Because these damages compensated for expenses incurred prior to the Graces' 1991 "permanent separation," recovery for "past medical loss" was properly classified as marital property.[33]

■ The category of damages allocated to "rehabilitation services" in 1991 was based on an analysis done by a rehabilitation counselor to prepare for negotiating the confession of judgment. The analysis provided high and low estimates of expected rehabilitation costs for James, including projected future costs for drugs, vocational training, future medical and surgical care, and residential care. It is unclear what portion of these damages can fairly be attributed to compensation for rehabilitation services costs incurred *after* the Graces' permanent separation; the record is silent on expenses incurred after 2000. As explained, the superior court was not required to take the parties' physical separation into account or treat it as a de facto divorce for purposes of characterizing recovery for post-separation expenses because "the parties [did] not provide sufficient evidence to make a reasonable allocation to a separate estate, [so] the award should be classified as marital property."[34] Under these circumstances, we cannot say the trial court abused its discretion by classifying the recovery allocated to "rehabilitation services" as marital property.[35]

29. *Bandow*, 794 P.2d at 1350 (holding that, absent sufficient evidence of the allocation of a tort recovery to one spouse's separate estate, the spouse asserting that a portion of the recovery is indeed separate bears the burden of proof).

30. *Id.*

31. *Id.* at 1348–49.

32. Mr. Peterson testified: "We knew for a fact the exact amount of the medicals ... as a result of Mr. Grace's being hospitalized and treated."

33. *See Bandow*, 794 P.2d at 1348–49. Expenses incurred during a marriage are presumptively

marital. *See Jones v. Jones*, 942 P.2d 1133, 1137 (Alaska 1997) (holding that doctor's fees incurred during the marriage should be included in the marital estate).

34. *Bandow*, 794 P.2d at 1350.

35. James attempts to argue that "past medical loss" and "rehabilitation services" should be classified as separate property because, like damages for pain and suffering, James's rehabilitation costs are "intimately [and] directly related to James Grace alone," and past medical expenses are "personal to James Grace" because "[h]e incurred the injuries." But this court's discus-

We affirm the superior court's classification and distribution of the funds received from Integrity's receiver.[36]

## B. It Was Error To Divide The INA Proceeds Equally.

 The superior court ruled that the funds received from INA were compensation for settling the insurance bad faith claim that was assigned to the Graces, not compensation for the Graces' personal injury and loss of consortium claims against Ocelot and Bell. The court treated the INA proceeds as marital and equally divided them between the parties. In reaching this ruling, the superior court reasoned that the insurance bad faith cause of action was "separate and distinct from the underlying tort action" and that the assignment implied both Graces were to "share the benefits as well as the burden" of litigation against INA. James argues that the funds from INA should be treated as a "personal injury recovery"—and thus his separate property—because "[t]here is no logical distinction ... between a personal injury recovery which is paid voluntarily ... and a recovery based on personal injury which requires litigation to enforce payment." Kathleen argues that "the INA funds are the result of the Grace[s'] willingness to accept an assignment of rights from [Bell and Ocelot] to pursue a 'bad faith' insurance claim against [INA]" and should therefore be treated as a bad faith insurance claim and divided equally between the parties. We agree with James, at least in part.

 The nature of the separate bad faith claim is not dispositive of the classification of this asset. In Alaska, classification of tort recoveries for purposes of marital property division depends on the loss the recovery was intended to replace, not the nature of the cause of action giving rise to recovery.[37] In *Bandow*, we explained the "analytic approach" to classification of tort recoveries for purposes of dividing marital estates:

> [T]he purpose for which the recovery is received controls its classification; a recovery, or portion thereof, being classified as *that which it is intended to replace.* To the extent the recovery compensates for losses to the marital estate, it is marital property. To the extent the recovery compensates for losses to a spouse's separate estate, it is his or her separate property.[38]

Here, Bell assigned to the Graces "any rights, causes of action, or claims that Bell has or may have resulting from the breach of the fiduciary, duty of good faith, or contractual duties existing between Bell and any insurance carrier." But in order to acquire those rights and the resulting recovery against INA, the Graces *gave up* the right to execute on the judgment entered against Bell on the claims arising from James's personal injuries, including Kathleen's loss of consortium claim.[39] The Graces' recovery against INA was "intended to replace"[40] the underlying claims of both parties and should be classified as a combined recovery for personal injury and loss of consortium. It should be divided in the proportions identified by the expert analysis of the anticipated verdict prepared at the time of the settlement with Ocelot.[41]

---

sion in *Bandow* of losses that are "so personal to the claimant spouse that classifying them as marital property would be inequitable" referred only to damages for "pain and suffering, mental anguish," and other "non-economic loss." *Bandow*, 794 P.2d at 1349. We noted in *Bandow* that, in contrast, "the diminution of the marital estate by loss of past wages or expenditure of money for medical expenses" is "truly shared" among married parties. *Id.*

36. James's brief lists "past economic loss" in the heading that precedes the presentation of his argument that the court incorrectly classified some of the losses that resulted from James's accident as "marital," but he did not separately argue that the superior court erred by treating "past economic loss" as a marital loss.

37. *Bandow,* 794 P.2d at 1348.

38. *Id.* (emphasis added; internal citations omitted).

39. *Grace v. Ins. Co. of N. Am.,* 944 P.2d 460, 463 (Alaska 1997) ("Bell confessed judgment based on an anticipated verdict of $8,120,920.... In return, the Graces agreed not to execute the judgment against Bell.").

40. *Bandow,* 794 P.2d at 1348.

41. *See supra* note 3.

The superior court correctly ruled that the Integrity proceeds attributable to Kathleen's claim for loss of consortium should be classified as her separate property. But only some components of James's claim for personal injury—specifically, the portions allocated for "past pain and suffering," "future pain and suffering," and "loss of enjoyment in life"—are his separate property because this recovery was clearly intended to compensate for damages he alone sustained. The other components of James's personal injury recovery—those allocated for "past economic loss," "past medical loss," and "rehabilitation services"—were properly considered marital because the superior court did not have evidence that the Graces stopped operating as an economic unit following their physical separation. The superior court also did not have evidence showing how much of the total recovery was spent on expenses falling into each of these categories since the date of the recovery.

## V. CONCLUSION

We AFFIRM the superior court's division of the Integrity proceeds, but REVERSE its division of the INA proceeds. We remand for division of the INA recovery based on *Bandow.*

FABE, Justice, not participating.